**INTERLAKE IRON CORPORATION**
v.
**NATIONAL LABOR RELATIONS BOARD.**

No. 7905.

Circuit Court of Appeals, Seventh Circuit.

Oct. 27, 1942.

Henry E. Seyfarth, Lee C. Shaw, and Charles D. Preston, all of Chicago,. Ill., for petitioner.

Robert B. Watts, Ernest A. Gross, Gerhard P. Van Arkel, Asst. Gen. Counsel, and Roman Beck, and Edward J. Creswell, Attys., National Labor Relations Board, and Howard Lichtenstein, all of Washington, D. C., for respondent.

Before EVANS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The petitioner, Interlake Iron Corporation, hereinafter referred to as the company, seeks to review and set aside an order of the National Labor Relations Board, hereinafter referred to as the Board, and the Board is requesting that the order be enforced.

The Board found that the company in violation of Section 8(1) of the Act, 29 U.S.C.A. § 158(1), had interfered with, restrained and coerced its employees in the exercise of their rights under Section 7 of the National Labor Relations Act, 29 U.S. C.A. § 157; and further, that the petitioner had laid off and failed to rehire eight employees because of their union membership and activities, thereby violating Sections 8(1) and 8(3) of the Act. The Board issued an order that the company cease and desist from its unfair labor practices, that it offer reinstatement with back pay to the eight employees found to have been discriminated against, and that it post appropriate notices.

The question presented on this appeal is whether or not there is substantial evidence to support the Board's findings.

First, as to the unfair labor practices in violation of Section 8(1). The evidence shows that the petitioner operated in the city of Chicago, Illinois, blast furnaces and coke ovens and employed between nine hundred and a thousand men; that in 1933 some of the employees of the company obtained from the American Federation of Labor a charter and started organization of the employees in an organization called the Independent Gas Workers Union. The company took swift and drastic action by discharging the officers and known members of the organization. The employees were subsequently reinstated, following intervention of the National Labor Board of the National Recovery Administration, but this organization was never revived.

In 1933 the company openly sponsored, supported and dominated a company union, which continued in existence until the National Labor Relations Act was held constitutional, when the company in good faith abandoned the company union. During the year of 1935, while there was pending before the Congress the legislation which afterwards became the National Labor Relations Act, the manager of the company prepared a telegram to be sent to Congress in opposition to the passage of the bill, and then called the employees to his office and had them sign the telegram.

Thus it will be seen that up until the time the National Labor Relations Act was held constitutional, the attitude of the company was one of violent opposition to labor organizations, except the independent organization which it had dominated.

After the Supreme Court had sustained the National Labor Relations Act, a campaign to organize the employees of the company got under way, with two rival organizations in the field: one an independent union, hereinafter referred to as the association, and the other an affiliate of the Congress for Industrial Organizations, hereinafter called the union. The campaign went forward, and an election was held under the supervision of the Board to determine the bargaining agency for the company's employees. The independent association won. The company was absolved by the Board of any support or domination of the association.

During the campaign one Harper, an employee, let it be known in the dressing room of the employees, where some fifty or sixty men were assembled, including some of the foremen, that he, Harper, had canvassed his department and ninety-eight per cent were in favor of the CIO, and that he was going to join the CIO and work for its organization. This was immediately reported to Mr. Waggoner, the manager of the company, and he sent for Mr. Harper. Waggoner inquired of Harper what the sentiment was in the plant, and Harper told him in his department they favored the CIO. Waggoner proceeded to tell Harper that the leaders of the CIO were communistic, and appealed to Harper because of his Catholic religion not to have anything to do with the CIO. On another occasion, Waggoner said to Harper, referring to his union activities, that "he had two roads to choose from, the right and the left."

In June of 1937, one Eagleton, an employee who was acting as chairman of the union, had a conference with the company manager, Waggoner, regarding a grievance of an employee. On this occasion, they discussed the Republic Steel Corporation strike then going on in South Chicago. At this time, Waggoner stated to Eagleton that if the Republic Steel Corporation could not run its plant the way it saw fit, it would close up, and that Republic Steel would never sign a contract with the CIO because "it was communistic, irresponsible and not incorporated"; and he said to Eagleton, "Why don't you use your head and break away from this communistic outfit? * * * the Employees Association will get you as far as the CIO."

The second shift foreman, Schrock, said to one of the employees who was wearing his union button, "What have you got that on for? You are throwing your money away," and this same foreman on another occasion when an employee was hit on the head with a sledge hammer, remarked, "Well, you won't hurt his head so long as you don't hurt his buttons,"—referring to the CIO button on his cap.

One Newsam, an employee, testified that the relief foreman, Buckner, came to him in August of 1937 and told him that "if he expected to get anywhere" he would have to join the association; whereupon Newsam replied that he did not recognize the association as a union, and Buckner replied, "That's up to you, but it may cost you something."

Another employee, Woods, testified that Buckner said to him in April, 1938, "the company wouldn't stand for any outside union to come in and organize their employees," and that if an attempt was made to organize the employees in the company's plant, the same thing would happen that happened at Republic Steel.

Another foreman, Raybould, on December 20, 1938 (sic), said to an employee that he should take off his CIO button and quit being active in the CIO, adding, "You ought to know you are on the spot."

Another supervisor, Roberts, told an employee, Kostuch, prior to the holding of the election that if the union won the plant would close, and that the manager, Waggoner, had ordered that all the employees be so informed.

Another foreman, Petrich, told one of the employees that the buttons would not do him any good and the union would not be effective in protecting him, that the company could always find excuses for discharging him.

We think this constituted substantial evidence of the continued hostility of the company towards the union; that this amounted to interference with the employees' efforts to organize freely and was in violation of their rights under Section 7; and that it was sufficient to sustain the Board's finding on this point. H. J. Heinz Company v. National Labor Relations Board, 311 U.S. 514, 520, 521, 61 S.Ct. 320, 85 L.Ed. 309; International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50; Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 126 F.2d 452, certiorari denied, Oct. 12, 1942, 63 S.Ct. 45, 87 L.Ed. ——; National Labor Relations Board v. W. A. Jones Foundry and Machine Company, 7 Cir., 123 F.2d 552.

We come now to a consideration of the alleged discriminatory discharges in violation of Section 8(3). The trial examiner found that four employees, namely, Rose, Woods, Buchler and Knezevich, were discharged because of their union activities, while the Board found that these four and also Cipich, Newsam, Bulich and Beckley were discharged because of their union activities.

Because of the business recession beginning in the fall of 1937, it is undisputed in the evidence that the company was com-

pelled to and did between November, 1937 and June, 1938, lay off, not discharge, 383 of its 922 employees. It is admitted that no one was ever employed to take the place of these employees laid off during the layoff period. In other words, it was a bona fide layoff. In the layoff of the 383 employees, the examiner found that four had been discriminated against because of their union activities, and the Board found that eight had been so discriminated against. The company denied that the employees were discharged because of their union activities, and contended that they were discharged in accordance with a merit rating system which the company had installed.

In 1936 the company's officials had begun an investigation and study of merit rating systems. There is no intimation in the record that this was not a good faith effort on the part of the company to devise a plan for evaluating the worth of an employee to the company and to give proper consideration to the length of his service. In the opinion of Professor Walters of Purdue University, an expert on personnel matters and rating systems, the system was a satisfactory plan, reliable and valid. Under the rating system the employee was rated on 8 points, scored as follows: excellent, 5 points; good, 4 points; fair, 3 points; and poor, 2 points. To this total score was then added a service rating to take care of seniority. There were other features to the rating system, but these were the main features. The scoring under this system was to be done by the supervisory officials of the company. The employees were not informed that such a system was in vogue, although there was no effort made actually to conceal it from them, and if any employee wished to know about his own rating, the information would be furnished him.

The first ratings under the system were made in the early part of November, 1937, which was the same month the layoffs started. Thus, it will be seen that the rating system had just been instituted, was new, and the company and its supervisors had had no experience in its operation. Under this rating system, when it became necessary to lay off any employees, the employees with the lowest scores were to be the first to go. When the layoffs came in November, 1937 and continued to June, 1938, the rating system was used to deter-

mine who should be laid off. The system was followed in the case of the eight men in question, and each was laid off in order, according to the rating shown, except in the case of Bulich and Woods. In the case of Bulich, three men in another department who were rated lower than he were retained for approximately ten days after Bulich's layoff. Two of the men retained belonged to the association. The affiliation of the other employee retained does not appear, as the Board did not permit the roster of the union to be placed in evidence.

Also, one employee, Sicich, was retained eleven days after employee Woods was laid off, although Sicich had a lower rating than Woods. Whether Sicich was union or nonunion does not appear. All the other employees were laid off in their proper order and according to the rating system.

With these points of difference as to Bulich and Woods, the cases are very much the same. One or two of the employees among the eight were a little more prominent in the union than the others, although none of them was exceptionally prominent.

Let us consider the case of Paul Bulich. He was laid off November 15, 1937. The Board found there was discrimination in his layoff and that such discrimination was due to his union activities. It is true Bulich was not laid off in accordance with the rating plan, because three men with lower ratings were retained for ten days after Bulich was laid off. We shall assume, as the Board doubtless did, that this was a discrimination against Bulich. For this and other reasons, quite involved, over the transfer of men about the departments in making adjustments in the layoff, the Board found "that Bulich's layoff was not in accordance with the respondent's usual procedure." We therefore start, as the Board doubtless did, with the assumption that there was discrimination against Bulich in the manner of his layoff.

That brings us to the next step in the case, namely, was Bulich discriminated against in the matter of his layoff because of his union activities? That is the crux of this case. There may be mistakes, departure from the regular procedure, and discrimination in the layoff, but the National Labor Relations Board has no concern unless the discrimination was due to union activities. The first inquiry is, did

the company's supervisors who rated Bulich and laid him off know he was a union man? There is no direct evidence that they did, but it appears in evidence that Bulich wore his union button around the plant. There is no evidence that the supervisors who rated him saw him wearing the button. But it is a fair inference that his supervisors knew he was a union man from the circumstance of his wearing the button and talking to others about the union.

Having laid him off discriminatorily and knowing he was a union man, the next inquiry is, was the discrimination against him because he was a union man? The Board found it was, by this method of reasoning and drawing of inferences:

It will be recalled that the first ratings under the merit system were made in November. Bulich was laid off November 15, so the supervisors had had no experience with the system at the time. Nicklaus, the assistant superintendent, rated Bulich in November for the first time, just prior to November 15, the date Bulich was laid off. The Board found that the discrimination because of his unionism was inferable from these facts:

Six months after he had rated Bulich, Nicklaus saw another employee, Woods, wearing a CIO button. In a good-natured manner with a grin on his face, Nicklaus said: "Ah! watch your step." From that statement and the fact that the company had been hostile to the union the Board inferred that Nicklaus was hostile to the union. This is stretching pretty far the right to draw reasonable inferences, but the Board did not stop there. The next inference from the foregoing inference of hostility was that the rating Nicklaus gave Bulich was discriminatory, and that he was laid off ahead of three men with lower ratings because Nicklaus was hostile to the union. And then upon that inference upon an inference, the Board piled another one —that the low rating and the layoff out of line with the merit rating system were for the purpose of discriminating against Bulich in the layoff.

These are the inferences upon inferences the Board had to draw in order to find that the discriminations in the layoff were because of the union activities of Bulich. We recognize the right, the exclusive right, of the Board to draw reasonable inferences from the facts found.

That is the province of the Board, and when inferences are reasonably drawn they constitute evidence and must be accepted by the courts as such; and inferences alone may, if reasonable, provide a link in the chain of evidence and constitute in that regard substantial evidence. But an inference cannot be piled upon an inference, and then another inference upon that, as such inferences are unreasonable and cannot be considered as substantial evidence. Such a method could be extended indefinitely until there would be no more substance to it than the soup Lincoln talked about that was "made by boiling the shadow of a pigeon that had starved to death." National Labor Relations Board v. Empire Furniture Company, 6 Cir., 107 F.2d 92, 95; National Labor Relations Board v. Illinois Tool Works, 7 Cir., 119 F.2d 356. The mere fact that the company had a background of hostility to the union in and of itself does not show discrimination in hiring and firing under Section 8(3). If it did, then every case of Section 8(1) violation would be a violation of Section 8(3) if any employee had been discharged.

The Board also held that "respondent failed to show that Bulich was a less efficient or less valuable employee than the employees in his occupational unit who received higher ratings." We do not think any such burden rests upon the company. It was the burden of the Board to show that Bulich was not only discriminated against in his rating and therefore in the layoff, but that the discrimination was caused by his union activities. It is not sufficient for the Board to show that the system is capable of being used discriminatorily. It must go further and show that it was used discriminatorily and that the discrimination was because the employee upon whom the system was thus used was a union man and the discrimination was because of his union activities. This burden is not met by showing that the company was hostile to the union and the inferences drawn from what Nicklaus knew and did, as we have indicated above.

The Board cannot shift the burden of proof or impose what it chooses to call the duty of the company to go forward with the evidence by showing the system of merit rating used in facilitating a layoff is subject to discrimination, and that the company and its supervisors who employed the merit rating system are hostile

to the union, and then require the company to prove to the Board's satisfaction that each employee upon whom the system was used was not only treated fairly in the rating but that he was not discriminated against because of his union activitites.

■ The company does not have to prove non-discrimination because of union activities. The Board must prove discrimination because thereof. This burden of the Board to prove discrimination and to prove that discrimination was employed in the hiring or firing of a man because of his union activities does not shift from the Board. National Labor Relations Board v. Union Manufacturing Co., 5 Cir., 124 F.2d 332, 333; Hazel-Atlas Glass Company v. National Labor Relations Board, 4 Cir., 127 F.2d 109.

We think the Board did not show that Bulich was discriminated against in his layoff because of his union activities.

The reasoning of the Board as to discrimination because of union activities follows the same line with reference to the other seven men as it followed in the Bulich case, except that in the case of Beckley the circumstances are less persuasive than in the Bulich case. In the Beckley case, he was laid off in his order under the merit rating system. The Board found that foreman Kimbel participated in the rating of Beckley in April, 1938, when his layoff was in May, 1938. The inferences of hostility against the union which led to the other inferences concerning low rating for the purpose of discrimination because of union activities grow out of the following circumstances:

In June, 1937 another employee, Henry Buchler, was soliciting funds in aid of one Harper, a former employee of the company who had been injured and who was at the time of his injury an organizer of the union. Buchler asked Kimbel for permission to solicit funds in aid of Harper among the workers in the coke department during working hours. The company had a rule against such solicitation and Kimbel reminded Buchler of it. Notwithstanding the rule, Kimbel suggested that they go down and see Superintendent Nicklaus and see if they could not get permission to solicit funds. While walking through the plant in search of Nicklaus, Kimbel remarked to Buchler, "Henry, don't have quite so much to say. I have known you for a long time. It will be better for you."

From this statement of Kimbel, the Board inferred that Kimbel was hostile to the union. In our opinion, this statement cannot be tortured into a statement of hostility to the union. The parties were not even talking about union affairs at the time. Furthermore, it does not appear from the Board's finding whom Kimbel assisted in rating Beckley. The statement of Kimbel did not warrant the inference that he was hostile to the union, let alone the further inference that because of his hostility he rated Beckley lower in order to use it against him in the layoff. In fact, there is no evidence in the record that Kimbel knew Beckley was a union man. Obviously, even though Kimbel may have been hostile to the union, if he did not know Beckley was a union man he could not have discriminated against Beckley because of union activities.

■ Since the Board's reasoning on all eight of the employees as to discrimination because of union activities follows the same line, we hold that there is not substantial evidence to support the Board's finding that there was discrimination against these eight employees because of their union activities.

The Board's order will therefore be enforced, except as to that part relating to the alleged discrimination against the eight employees laid off.