## NATIONAL LABOR RELATIONS BOARD v. WHITIN MACHINE WORKS.
### No. 4713.

United States Court of Appeals
First Circuit.
June 5, 1953.

884

insville, Massachusetts, and employs approximately 5600 people. About 3200 of respondent's production and maintenance employees are represented by the United Steelworkers of America, CIO, and about 50 by the Patternmakers Association. The Board's jurisdiction is not contested.

In proceedings instituted by the United Steelworkers of America, CIO, the Board found that the respondent interfered with, restrained and coerced its employees in violation of § 8(a) (1) of the Act by discriminatorily discharging Raymond M. Tancrell, an accounting department employee, in violation of § 8(a) (3). The Board thereupon issued the usual order requiring respondent to cease and desist and to take certain affirmative action, including the reinstatement of Tancrell with back pay.

The sole question presented is whether substantial evidence on the record considered as a whole supports the findings of the Trial Examiner, which were adopted by the Board, that the respondent discharged Tancrell because he was attempting to organize the approximately one hundred and fifty workers in the accounting department.

Marcel Mallet-Prevost, Washington, D. C., Attorney (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel and Jean Engstrom, Washington, D. C., Attorney, on brief), for petitioner.

George H. Mason, Worcester, Mass. (Vaughan, Esty, Crotty & Mason, Worcester, Mass., on brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

The National Labor Relations Board, pursuant to the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A., § 151 et seq., has petitioned this court for enforcement of its order of July 21, 1952, under § 10(e) of the Act, against the respondent Whitin Machine Works.

The respondent is a Massachusetts corporation engaged in the manufacture, sale and distribution of textile machinery at Whit-

When a charge is made that by firing an employee the employer has exceeded the lawful limits of his right to manage and to discipline, substantial evidence must be adduced to support at least three points. First, it must be shown that the employer knew that the employee was engaging in some activity protected by the Act. Second, it must be shown that the employee was discharged because he had engaged in a protected activity. National Labor Rel. Bd. v. Reynolds Internat. Pen Co., 7 Cir., 1947, 162 F.2d 680; National Labor Relations Board v. Citizen-News Co., 9 Cir., 1943, 134 F.2d 970; Interlake Iron Corp. v. National Labor Relations Board, 7 Cir., 1942, 131 F.2d 129. Third, it must be shown that the discharge had the effect of encouraging or discouraging membership in a labor organization. See Wells, Inc., v. National Labor Relations Board, 9 Cir., 1947, 162 F. 2d 457, 459, 460. The first and second points constitute discrimination and the practically automatic inference as to the third point results in a violation of § 8(a) (3). See National Labor Relations Board

v. Gaynor News Co., 2 Cir., 1952, 197 F.2d 719, 722, certiorari granted, 1953, 345 U.S. 902, 73 S.Ct. 640; But cf. National Labor Rel. Bd. v. Reliable Newspaper Del., 3 Cir., 1951, 187 F.2d 547.

Until there is a reasonable basis in the evidence for making these findings, the employer need not excuse or justify his action. See National Labor Rel. Bd. v. Reynolds Internat. Pen Co., supra, 162 F.2d at page 690; Interlake Iron Corp. v. National Labor Relations Board, supra, 131 F.2d at page 133. When the evidence of the charging party has raised a reasonable inference of discrimination, that inference may still be rendered unreasonable by the employer's excuse or justification, see Ohio Associated Tel. Co. v. National Labor Relations Bd., 6 Cir., 1951, 192 F.2d 664, 666; Wyman-Gordon Co. v. National Labor Relations Board, 7 Cir., 1946, 153 F.2d 480, 487, so that more evidence must be produced to establish the alleged discrimination. See National Labor Relations Board v. Mylan-Sparta Co., 6 Cir., 1948, 166 F.2d 485, 490.

In order to supply a basis for inferring discrimination, it is necessary to show that one reason for the discharge is that the employee was engaging in protected activity. It need not be the only reason but it is sufficient if it is a substantial or motivating reason, despite the fact that other reasons may exist. See National Labor Rel. Bd. v. Electric City Dyeing Co., 3 Cir., 1950, 178 F.2d 980; Edward G. Budd Mfg. Co. v. National Labor R. Board, 3 Cir., 1943, 138 F.2d 86, 90, 91, certiorari denied, 1944, 321 U.S. 778, 64 S.Ct. 619, 88 L.Ed. 1071. Although the discharge of an inefficient or insubordinate union member or organizer is lawful, it may become discriminatory if other circumstances reasonably indicate that the union activity weighed more heavily in the decision to fire him than did dissatisfaction with his performance. Motivation is an elusive fact, and this gives rise to the difficulty of assessing the strength of the inference that Tancrell was fired because of his union activity.

There is ample evidence in this case that respondent was aware that Tancrell was active in a concerted movement among the clerks and office workers of the respondent's accounting department. Sometime in February of 1951, about two months before Tancrell's discharge, he was one of forty-three signers of a petition for a wage increase. The company's controller, Max F. Thompson, responded to this petition with a letter assuring the employees of the accounting department that their petition would receive sympathetic consideration and inviting them to seek individual interviews for the discussion of any particular grievances. Pursuant to this general invitation, Tancrell sought and obtained an interview with Thompson on the day following publication of the letter. During this interview, Thompson indicated his dissatisfaction over the fact that Tancrell, whom he considered as a supervisor, should have found it necessary to resort to "group activity," in concert with subordinate employees, for the adjustment of wage grievances. Thompson testified that thirty of the forty-three petitioners were given increases shortly after their request, and twelve others received raises sometime later. Besides Tancrell, there was only one other individual carrying a supervisory title who signed this petition and Thompson testified that the company looked with disfavor on the performance of this person and was trying to ease him out of his job.

Subsequently, on April 12, 1951, Tancrell solicited the aid of Mrs. Cahill, an employee in the Methods Department, whose customary duties included the compilation of names and addresses of employees for various purposes. Tancrell asked Mrs. Cahill to obtain a list of the names and addresses of employees in the Methods Department for the use of a union he was attempting to organize. There is evidence that in obtaining this list, Mrs. Cahill concealed and even misrepresented its purpose, which considerably annoyed the employees who signed and greatly disturbed the heads of the department. When Thompson discharged Tancrell on April 18, 1951, he made no mention of this incident, but alluded solely to Tancrell's failure to measure up to the

standards expected of a supervisor. Respondent admits that Tancrell's participation in the unauthorized and irregular circulation of this list "accelerated" its decision to terminate Tancrell's services.

However, this admission by no means disposes of the issue of respondent's motivation because the company adduces several other reasons justifying the dismissal of Tancrell. First of all, respondent contends that Tancrell does not even come under the protection of the Act because he is a supervisor.[1]

In 1947 Tancrell was hired by Thompson as Assistant Supervisor of the Statements Division of the Accounting Department. This division worked on profit and loss data and consisted of Garcelon, the Supervisor, Tancrell, Assistant Supervisor, and two female clerks. The work was more or less of a routine nature. During certain rush periods, clerks were borrowed briefly from other divisions to augment the staff of the Statements Division. Tancrell directed these clerks, but since the work was routine, this could not properly be called supervision and most of the time he merely relayed orders from Thompson and Garcelon. During frequent absences of Garcelon in the course of a day, sometimes for a whole day and at least once for a period of about two months, Tancrell had charge of the office, but here again, the routine nature of the work detracts from the significance of this fact. Not once during more than four years of employment did Tancrell recommend the hiring or firing of any employee, nor does it appear that he was ever told that he could do so, although respondent insists that he possessed the authority. Under the respondent's elaborate system of job evaluation, Tancrell received a rate of pay accorded to "Labor Grade 6", which concededly included non-supervisory employees. It is also conceded that respondent carried on its payroll non-supervisory employees with a higher labor grade classification than Tancrell's, a fact which respondent somewhat neutralizes by the explanation that the number of employees and the diversity of operations necessitate a classification for wage purposes which does not truly reflect the supervisory status of some employees.

■ We think the evidence considered as a whole supports the Board's finding that Tancrell was not a supervisor and therefore is entitled to the protection of the Act. As we have had occasion to emphasize recently, National Labor Relations Bd. v. Quincy Steel Cast. Co., 1 Cir., 1952, 200 F.2d 293; National Labor Relations Board v. Leland-Gifford Co., 1 Cir., 1952, 200 F.2d 620, supervisory status may depend on any one of a number of factors, and although the bare existence of any one of the powers enumerated in § 2(11) makes a man a supervisor, yet the absence of any exercise of authority may in certain cases negative its existence despite asserted incidents of a supervisory title.

Considering Tancrell's pay, the composition and size of the Statements Division, the nature of the work it performed, and the conduct of the office during Tancrell's employment, we cannot say that the Board lacks substantial evidence to support its finding. Universal Camera Corp. v. National Labor Relations Bd., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

In National Labor Relations Board v. Citizen-News Co., supra, the court said in 134 F.2d at page 974: "The fact that a discharged employee may be engaged in labor union activities at the time of his discharge, taken alone, is no evidence at all of a discharge as the result of such activities. There must be more than this to constitute substantial evidence." The real issue in this case is whether substantial evidence exists to support inferences that respondent fired employee Tancrell because

[1]. 29 U.S.C.A. § 152(11) provides: "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

of his union activity or as the respondent says, because of "his attitude of hostility, cynicism and indifference, lack of initiative and negative qualities."

There is evidence of such an attitude and in effect this was the reason given for the summary discharge on April 18, 1951, when Thompson told Tancrell that he was being fired because he wasn't measuring up to respondent's standards. Furthermore, the Trial Examiner specifically found that there was no background of union hostility on the part of the respondent, which has a history of amicable labor relations with its organized production and maintenance employees.

Thompson testified that he began to be dissatisfied with Tancrell in the summer of 1948 which was about a year and a half after Tancrell was hired. In October 1949, Thompson considered a personnel change which would require promotion of Tancrell to Garcelon's position as supervisor of the Statements Division, and Thompson testified that his reflection on this change so clarified his dissatisfaction that it prompted a mental determination to fire Tancrell. The source of this dissatisfaction was not merely the attitude manifested by Tancrell but also two or three alleged specific instances of conduct with some of the girls in the office which was in poor taste. However, nothing happened during the next year.

In October of 1950, Estes, who headed the Methods Department, complained to Thompson that Tancrell was setting bad example for clerks under Estes' supervision, specifically by eating lunch and reading a newspaper during working hours, with his feet perched upon a table; but there is no evidence that Tancrell was either reprimanded or warned.

When Tancrell joined in the petition for wage increase in February 1951, Thompson was disappointed at Tancrell's apparent ignorance of his supervisory status in not considering himself distinct from the ordinary clerks in the accounting department. An interview between Thompson and Tancrell, concerning salary and wages, during the latter part of March in the same year, served only to further confirm Thompson's poor opinion of Tancrell's capabilities. Finally, when it was brought to Thompson's attention on April 17, 1951, that Tancrell was connected with Mrs. Cahill's improper circulation of the list a few days before, he "slept on it overnight" and on the next morning, April 18, he called Tancrell into his office and fired him. Thompson testified that the circulation of the list was "the last straw."

Although this evidence clearly justifies respondent's dissatisfaction with Tancrell, it by no means conclusively establishes that that dissatisfaction motivated the discharge. Thompson was dissatisfied for about two and a half years without taking any action. Tancrell received neither a clear warning nor a strong intimation that he was not progressing satisfactorily. Garcelon related to him Thompson's "disappointment" over his participation in the wage petition, but this would hardly be taken as a notice of deficient work. When Thompson interviewed Tancrell about one month before the discharge, nothing was said concerning Tancrell's efficiency or deportment and the only dissatisfaction indicated concerned Tancrell's resort to "group activity," precisely the employee conduct protected by law.

It is admitted that Tancrell's attempt to get a list of the names and addresses of the employees for purposes of union organization "accelerated" his discharge. Although the manner in which this list was circulated would certainly justify the dismissal of any employee responsible, Tancrell's responsibility for this impropriety was not clearly established. It was shown only that Tancrell initiated the circulation, not that he encouraged the fraudulent manner of the circulation. Tancrell was not questioned about this matter at the time he was fired and there appears to have been very slight investigation of any wrongdoing on his part.

On the record before us, we can only say that there is substantial evidence from which to infer that Tancrell was fired because he had asked Mrs. Cahill to assist him in activity which is protected by the Act. Where conflicting inferences may be drawn it is not for us to disagree with

the findings of the Board. See National Labor Relations Bd. v. Southland Mfg. Co., 4 Cir., 1952, 201 F.2d 244.

A decree will be entered enforcing the order of the Board.