### SOUTH TACOMA MOTOR CO. v. NATIONAL LABOR RELATIONS BOARD.

#### No. 13546.

United States Court of Appeals
Ninth Circuit.

Sept. 18, 1953.

Eisenhower, Hunter, Ramsdell & Duncan, Tacoma, Wash., for petitioner.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Fannie M. Boyls, Atty., N.L.R.B., Washington, D. C., Edmond F. Rovner, Atty., N.L.R.B., New York City, Norton Come, Atty., N.L.R.B., Washington, D. C., for respondent.

Before HEALY and BONE, Circuit Judges, and LEMMON, District Judge.

LEMMON, District Judge.

Petitioner, the employer against whom charges of unfair labor practices within the meaning of section 8(a), subsections (1) and (3) of the National Labor Rela-

tions Act [1] were filed, seeks herein to review and set aside the final order issued by the National Labor Relations Board. The Board counters with a request for enforcement of the order.

Petitioner, South Tacoma Motor Company, is a corporation engaged in the service and sale of Chevrolet automobiles in the City of Tacoma, State of Washington. Automobile Salesmen Union, Local No. 1084, Retail Clerks International Association, A. F. L., hereinafter referred to as "Retail Clerks", was during the time herein mentioned, and had been for several years prior thereto, the sole bargaining agent for the salesmen employed by certain dealers, including petitioner. Petitioner's salesmen and petitioner were operating at all times pertinent under a collective bargaining agreement negotiated between an association of Tacoma automobile dealers and Retail Clerks.

The findings of the Examiner, so far as adopted by the Board, includes a recital of the evidence most favorable in support of the charges of unfair labor practices. They state that Sheehan, petitioner's manager, favored the Retail Clerks over Teamsters, infra, and fired Johnson, one of its salesmen, "so as to demonstrate to Johnson's co-workers that adherence to Teamsters might lead to their discharge". In addition, the Board found that Johnson and Pevey, another of petitioner's salesmen, were discriminated against by petitioner as a measure of reprisal in the allotment of cars obtained by them and that Johnson was discharged in violation of Section 8(a)(1) of the National Labor Relations Act [2] because of petitioner's belief that he or Pevey had filed with Guthrie, the secretary and treasurer of Retail Clerks, a complaint concerning "house deals". The Board also found that petitioner, in violation of Section 8(a)(3) and (1) had later discharged Johnson because of petitioner's belief that either Johnson or Pevey had lodged the complaint with Guthrie and because of Johnson's ad-

1. 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

2. 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

herence to Bakery Drivers and Salesmen Local Union No. 567, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. L., herein referred to as Teamsters.

The crux of the controversy is whether the reason for Johnson's discharge was the engaging by him in activities protected by the Act or for activities not so protected. Since we have concluded that there is wanting substantial evidence on the record considered as a whole to sustain the findings we proceed to set forth and analyze the evidence which it is claimed supports the findings of the Trial Examiner and the Board.

Considerable stress is placed upon events which took place early in April, 1950 at a meeting attended by all of petitioner's six salesmen, Guthrie, business agent for Retail Clerks, and Sheehan, petitioner's general manager. At this meeting there was discussed the propriety of petitioner's failure to pay to the salesmen commissions on "house deals" (sales by the management without the intervention of salesmen) in excess of three per month. The culmination was that Sheehan admitted that he had misinterpreted the pertinent provision in the agreement with the Retail Clerks. Petitioner acceded to a request of the employees that the commissions earned thereunder be paid beginning as of the previous March, and agreed to abide by the terms of the agreement as so clarified at that meeting. No ill will was evident during its progress, and it appears to have ended harmoniously.

A few days after this meeting relative to "house deals", there occurred a conversation between Sheehan and Jaques that was relied upon by the Trial Examiner as being part of the alleged "interferences, restraint, and coercion by the Respondent Company." Jaques testified as follows:

"Q. What two individuals were discussed there with you by Mr. Sheehan? A. He stated that he believed either Dal Pevey or Tracy Johnson to be the troublemaker.

"Q. Did he state what he meant by troublemaker? What trouble was he referring to? A. The troublemakers referred to by Mr. Sheehan were the people who questioned in regard to opening up the contract or the clarification of the working agreement that they were working under.

"Q. What did he say, or did he say anything in addition, or just point that out? A. Oh, he said, after all, that they would be dealt with accordingly when it was established. I gave him no information due to the fact that I did not know the one that had requested the copy of the contract."

The time element involved in this conversation will be discussed hereafter, in connection with the "house deal" meeting itself, (supra).

The Board found that petitioner discriminated against Johnson and Pevey in the filling of their car orders and that the discrimination was because of the activities of these two salesmen in connection with the "house deal" dispute. There are no concrete instances shown of any discrimination. We find only the broad statement made by some of the witnesses that there was such and a denial by other witnesses. We are unimpressed by these unsupported bald conclusions for the reason that if favoritism had been practiced specific instances could and should have been shown. There is no showing that such evidence could not be procured. The difficulties experienced by the management in getting shipment of cars as ordered would readily lend to a belief by a salesman that he was discriminated against.

In fact, it appears that all of the salesmen felt they were discriminated against. Petitioner had been placed upon a quota basis by the factory. During 1950, 14 models of Chevrolet cars were marketed, and cars came in 15 different colors. Often models and colors were not shipped as ordered. Nothing with

relation to the filling of orders was concealed from the salesmen. At the daily sales meetings invoices received since the previous meeting for cars shipped but not arrived were discussed, priority considered, and announcement made regarding the customers to whom delivery would be made. Had there been cause for complaint the reasons would have been apparent, because the names of the customers were posted chronologically as the orders were received. The dates when requisitions went to the factory, when automobiles were received from the factory, the names of the customers to whom delivery was made, and the dates of delivery, were all of record and available.

There is no evidence that either of these two salesmen ever complained of their treatment at any of these meetings. It might be here significantly added that it was the business of petitioner to satisfy its customers, that it was expected that petitioner would strive to do so, and that a discrimination between salesmen would also be a discrimination between customers. From aught that appears in the record, all of the orders were finally filled, including those procured by Johnson and Pevey.

Also unsatisfactory is the evidence which it is claimed supports the finding that Johnson was fired because of union activities. We find that Teamsters, during the middle of 1950, became active in a campaign to organize the automobile salesmen in Tacoma. Teamsters was then the bargaining agent for automobile salesmen in Seattle and Bremerton. Before October 3, 1950, the date of Johnson's discharge, petitioner had seen bulletins comparing the labor contracts in those cities with the one under which the Tacoma salesmen were working, and was otherwise aware of those activities. Sheehan discussed these contracts at a salesmen's meeting toward the end of September and stated that the Tacoma contract was the better. There is no

evidence that before October 3, Johnson was active in Teamsters or in the mentioned attempt to sign up the salesmen. Had he been active, this, taken alone, would be no evidence of a discharge as a result of such activities.[3]

Another circumstance that is claimed to sustain this charge arises out of a party had on Saturday, September 30, at the home of Roberts, one of the salesmen, attended by all of the salesmen and their ladies, at which the various contracts were discussed. Four of the six salesmen had signed cards (which appear to embrace a request for a bargaining agent election and not an application for membership in Teamsters). Thereupon Johnson asked for and signed one of the cards. Jaques, who appears to us to have been other than an unbiased witness, states he had a conversation with Wallerich, an official of petitioner, on the following work day. He relates no specific statement made by Wallerich revealing what he knew about the happenings on the evening of September 30th, though questions directed to elicit such knowledge were put to him. Jaques contented himself by saying "He (Wallerich) seemed to be very well informed as to the conversations that had transpired" and "He seemed to have more information than I did, so naturally we talked in generalities".

Wallerich denies unequivocally that he had any discussion with Jaques about the Roberts' party. He stated that he first learned about it and of Johnson's reputed labor activities weeks after October 2nd.

It cannot be fairly said this positive testimony is sufficiently contradicted by the loose and general conclusions which Jaques expressed and which are related above. All the salesmen were at the Roberts' party: why would Johnson have been singled out by the petitioner as an object of suspicion?

There is no evidence of anti-union background in petitioner's history.

3. National Labor Relations Board v. Citizen News Co., 9 Cir., 1943, 134 F.2d 970, 974; National Labor Relations Board v.

Whitin Machine Works, 1 Cir., 1953, 204 F.2d 883, 884.

188

The circumstance that management praised the terms of the present contract and thus inferred to the employees that it favored Retail Clerks over Teamsters is not a violation of the statute. N.L.R.B. v. Hollywood-Maxwell Co., 9 Cir., 1942, 126 F.2d 815, 824; "acquiescence or approval are not what the Act contemplates when it uses strong words such as 'interfere,' 'restrain,' 'coerce,' and 'dominate' in Section 8(a)(1) and (2)." Wayside Press Inc., v. N.L.R.B., 9 Cir., 206 F.2d 862.

As noted, six months intervened between the April meeting at which the "house deal" controversy was discussed and Sheehan's "troublemaker" remark, on the one hand, and the day when Johnson was discharged, on the other hand. There appears no testimony in the record that any of petitioner's officials knew that the complaint in this connection against petitioner was made to Guthrie by Johnson. The Board recognizes that. The finding is that petitioner discharged Johnson because of the Company's "belief" that either he or Pevey had filed the complaint. If that belief was in the mind of any official of the company it was in Sheehan's mind and Jaques tells us that Sheehan told him that he had that belief in the month of April, and Johnson says that Jaques informed him of this between the 7th and 11th of April. *The length of time elapsing before the discharge weakens materially the inference of cause and effect.* Sheehan denies that he inquired about or was concerned as to who registered the complaint. There is no substantial evidence to support any conclusion other than that if such belief was present at all, it exerted only an incidental and not a controlling or a *motivating influence in the discharge*, and that if such belief stood alone this employee would not have been discharged.

The record indicates clearly to us that the salesmen had no reason to believe that the discharge was the result of any protected activities of Johnson but that to the contrary—they understood that it resulted from difficulties between the two men in formulating and executing sales policies, culminating in the clash between them the day preceding the discharge.[4]

We consider that the substantial and moving reasons for discharge are those which *we now set forth.*

We learn from Sheehan that though Johnson was a successful salesman, he was in Sheehan's opinion a disturbing influence with the other salesmen in formulating and carrying out sales policies. Sheehan and the salesmen attended sales meetings at the beginning of each work day. At these meetings Johnson frequently took issue with the opinions and statements voiced by Sheehan. Sheehan considered him antagonistic. As one of the salesmen put it, relating a conversation with Sheehan, when "he, Sheehan, had built up a fighting spirit in we (sic) fellows to go and get more business, that Tracy (Johnson) would make a remark and knock down his—or deflate the entire picture. And that he just decided that he was not going to accept any more curves thrown at him, and that was the reason he discharged him". As Sheehan testified: "Q. Was there anything in his attitude at the sales meetings that was different than an attempt to work out a problem?" "A. I would say there was, in that on several occasions where I would make a statement on how to get out and sell these cars, get out and sell trucks, and that he on several occasions differed with my opinion openly in front of salesmen—in front of all the salesmen—and spoke out without any reservations at all, that he did not agree with my ideas on that."

With this background, we reach an incident which occurred on October 2d, referred to as the Adler sale. The house

188188188188

4. Cf. N.L.R.B. v. Whitin Machine Works, supra, 204 F.2d at page 884, where it is held that it must be shown that the discharge had the effect of encouraging or discouraging membership in a labor organization.

had made a sale of a car to a Mr. Adler, and shortly afterward Adler's son was involved in an accident in which the car was wrecked. Sheehan spoke to Johnson and another salesman, Hopper, and expressed regret that the Adler car would be returned a complete wreck so soon after purchase. Johnson said he was not sorry, or, as Johnson states he said: "You feel more sorry for him than I do". Sheehan was startled at this reply and inquired as to the meaning of the remark. A heated argument developed between the two men. Johnson says his remark was provoked by his belief that he was entitled to a commission on the Adler deal that he did not receive. It appears that young Adler had been a prospect of Johnson. This prospect was a minor and so Johnson informed the father that the car could not be sold to the boy. Thereafter the father saw Mr. Wallerich, who delegated to one of the employees the duty of procuring the father's signature to the order. Johnson had neither listed in writing nor given any notice to the management that he claimed the Adlers as his prospect, or that he had devoted any effort towards effecting the sale. At this heated session the words are attributed to Johnson, "He wouldn't buy the car from me. He bought the car from you, and he made a house deal of it so that he could get a discount." Sheehan disclaimed giving a discount, asserted the right to make "house deals" by any members of the firm.

No little of the friction seems to have arisen from the implication that the house would garner deals by giving discounts, which the salesmen were not authorized to give. In any event the unpleasantness engendered had not subsided when the men parted.

The next day, after a discussion which he had with Wallerich, Sheehan notified Johnson of his discharge.

Indicating as it does that Johnson's discharge was not due to any labor-organization activities on his part, Johnson's own testimony dealing with his parting colloquy with Sheehan is significant.

"Mr. Sheehan told me he had given a great deal of thought to the remark that I had said the day before, and he had decided that I should go some place else where the deals that I had would be handled to suit me better.

"I asked him what remark I had made, and he said the remark about the Adler boy, and then he went ahead to say how any man in that position could say such an asinine remark, was more than he could understand; and that he had not slept any the night before, and he had decided the next time anyone threw a curve at him like that, he wasn't going to take it; and I asked him if there was anything that I could say or do, and he assured me that there was not."

The disgruntled salesman's own version of this parting clash between the two men shows that the direct, proximate, and efficient cause of his discharge was his attitude about the Adler deal, and not his participation in any union activities, either at the April meeting or at any other time.

We find the evidence supporting the Board's decision to be unsubstantial, when viewed in the light of the entire record.

The petition to set aside the Board's order is granted and the petition for enforcement is denied.