No. 14722

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

BOARD OF TRUSTEES OF BILLINGS
SCHOOL DISTRICT NO. 2, of Yellowstone
County, Montana,

Petitioner and Appellant,

-vs-

STATE OF MONTANA, ex rel. BOARD OF
PERSONNEL APPEALS and BILLINGS EDUCATION
ASSOCIATION, a Montana non-profit corporation,

Defendant and Respondent.

Appeal from: District Court of the Thirteenth Judicial District,
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

James C. Capser argued, Billings, Montana

For Respondent:

Hilley and Loring, Great Falls, Montana
Benjamin Hilley argued, Great Falls, Montana
Jerry Painter, Helena, Montana

Submitted: September 21, 1979

Decided: DEC 21 1979

Filed: DEC 21 1979

Thomas J. Kearney
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

On July 18, 1977, a hearings examiner held that a school teacher had been dismissed in violation of her rights and that the Billings School District (School District) had interfered with this employee's rights. The hearings examiner ordered reinstatement with full back pay and benefits. On August 5, 1977, the School District filed exceptions to the order of the hearings examiner. On the day of the hearing on this matter the School District filed a motion to reopen the record to take additional evidence. On November 1, 1977, the Board of Personnel Appeals (BPS) affirmed the findings of fact, conclusions of law, and proposed order of the hearings examiner.

The School District filed for judicial review and made a motion to reopen the record before the District Court. The motion was denied and subsequently the District Court affirmed the BPS. From this judgment the School District appeals.

Ms. Widenhofer, the teacher on whose behalf the unfair labor practice charge was filed by the Billings Education Association (BEA), was first employed as a teacher in the School District during the years 1959-61. In 1973, she was again employed by the School District and taught a sixth grade class at the Poly Drive School during the academic years 1973-76. During this latter period Ms. Widenhofer was an active member of the BEA, serving as an alternate building representative, a member of the Legislative Committee, and a member of the Strike Financial Aid Committee.

From the record it appears that the School District was initially satisfied with Ms. Widenhofer's performance as a teacher. During the agency hearing on this matter the BEA introduced as exhibits written evaluations of Ms. Widenhofer's performance as a teacher. These evaluations, which uniformally gave Ms. Widenhofer good and excellent ratings in all areas, were written by the

- 2 -

Poly Drive principal and date from October 8, 1973, until March 3, 1975. The areas upon which the evaluations were based included personal traits, teacher-pupil relationships, instruction skills, classroom management, staff relationships and professional traits and teacher-pupil-community relations. During this time Ms. Widenhofer was a nontenured teacher.

The BEA called an economic strike on October 2, 1975, and Ms. Widenhofer, along with eight other teachers at Poly Drive went out on strike. Apparently, 102 nontenured teachers in the School District failed to report to work during the strike. Ms. Widenhofer had been active in prestrike preparations and along with another Poly Drive teacher, Ms. Sayler, actively picketed the Poly Drive School. Ms. Widenhofer had been active in encouraging her colleagues to participate in and support the strike. Ms. Widenhofer was the only nontenured Poly Drive teacher to picket her own school. Her picketing was visible as the parents delivered and picked up their children from school. On the first day of the strike, some of Ms. Widenhofer's students utilized anti-strike placards. Ms. Widenhofer continued to picket the Poly Drive School until October 17, 1975. Three days later, the strike was settled.

Soon after the strike was settled Ms. Widenhofer encountered problems with certain parents and school officials. On November 20, 1975, she and Ms. Sayler were asked to meet with a group of seven parents. These parents were concerned about a comment Ms. Sayler had made concerning her class. They also were upset with Ms. Widenhofer because she had asked a student where her mother had taught during the strike and because she had given a test in which all of her sixth grade classes had performed poorly. Later, the parents of another child came to school very upset and requested a conference with Ms. Widenhofer in regard to her questioning of their child as to the method in which a homework assignment was done.

As to these and other poststrike events the hearings examiner made the following findings:

"10.  On November 20, 1975, a group of seven parents asked to have a meeting with Ms. Sayler and Ms. Widenhofer.  One of the parents involved was Ms. Bowman.

"a.  Notice of the meeting was given to the two teachers involved after lunch that there was going to be a meeting with the parents that afternoon.

"b.  The meeting concerned a question asked by Ms. Widenhofer of Ms. Bowman's daughter, Amy, as to which school Ms. Bowman taught at during the strike.  Evidently Ms. Bowman filled in as a teacher when the teachers struck.  Ms. Bowman claimed that the school was intimidating and psychologically damaging her child by asking this type of question of Amy.

"c.  The other parents at the conference were parents of Ms. Sayler's students and they were annoyed because Ms. Sayler had told them that the group of sixth graders were a tough group to handle.

"d.  Finally the parents were upset because Ms. Widenhofer had given a test in which the four sixth grade classes had done poorly.

"11.  After the meeting with the parents, Ms. Sayler and Ms. Widenhofer expressed their concern over the meeting to Mr. Croff, the school principal, and stated that the next time they would either like to have a tape recorder or a BEA representative present. Mr. Croff stated that a tape recorder could not be used without the permission of all persons present at the meeting and also said that the meeting concerned the teachers and parents and to keep the BEA out of it.

"12.  At the same conversation with Mr. Croff, Mr. Croff indicated to Ms. Widenhofer that he was disappointed that she had gone out on strike against him because he had hired her.

"13.  In another incident, Ms. Widenhofer assigned her class to make a family coat of arms.  One child made the coat of arms on old paper.  Ms. Widenhofer questioned the child if she had done it.  When the child replied, 'yes', Ms. Widenhofer pointed out that the paper was old and the scotch tape was yellowed.  The parents of the child came to the school very upset and explained that the child had used materials that the mother had kept from when she had taught kindergarten.

"a.  Mr. Croff  did not attend the meeting with the parents even though it was his policy to usually attend meetings with parents and teachers.

"14. On January 28, 1976, Ms. Widenhofer and Ms. Sayler again talked to Mr. Croff concerning some rumors that there was a drive to have them removed from their teaching position. Mr. Croff remarked that the rumors were from the BEA rumor mill. Mr. Croff went on to remark that he had heard rumors that there was a petition being circulated concerning Ms. Widenhofer's removal.

"15. On February 3, 1976, Mr. Frank, assistant superintendent of school [sic] in the elementary division visited Ms. Widenhofer's room. No written evaluation resulted from that visit.

"a. After Mr. Frank visited Ms. Widenhofer's room, Ms. Widenhofer had a conference with Mr. Frank. Mr. Frank indicated that he was not there to save Ms. Widenhofer's life or skin, that it might be too late for that. Mr. Frank indicated that everyone else in the district had gotten back to normal after the strike except Ms. Widenhofer, that she had held a grudge and that she had upset several parents, and that he had had several phone calls about it. He went on to state that Ms. Widenhofer was not getting along with the staff at Poly Drive and that he, Mr. Frank, did not feel welcome in Ms. Widenhofer's room.

"b. Ms. Widenhofer asked if Mr. Frank thought a transfer would be feasible. Mr. Frank stated no, that they would not bow to parent pressure any more as far as transfers go.

"c. Mr. Frank said no one should know what was said during the conference except for Ms. Widenhofer's husband. Mr. Frank's suggestion for improvement was that Ms. Widenhofer try to be pleasant and smile a lot. Nothing was said about Ms. Widenhofer's classroom performance.

"16. Mr. Frank again visited Ms. Widenhofer's classroom on February 12, 1976. Upon his leaving Ms. Widenhofer asked if he had heard anything more from any parents. Mr. Frank said no, and said that he knew Ms. Widenhofer could do the job, just keep smiling.

"17. On February 20, 1976, Ms. Widenhofer had a discussion with Mr. Croff. Mr. Croff came into her classroom when she was free and said that nine letters had been admitted to the school board, to Mr. Frank and himself, by parents who were unhappy with what Ms. Widenhofer was doing.

"a. Four of the letters had been written by parents whose children had been in Ms. Widenhofer's class in previous years.

"b. Although Ms. Widenhofer requested to see them, and although Mr. Croff agreed to show them to her, later he changed his mind and decided that she should not see them since they had been addressed to him.

- 5 -

"18. On February 20, 1976, Mr. Croff asked Ms. Widenhofer how she felt about the situation and if she would ever strike again. Ms. Widenhofer responded that she would never put her family through it again.

"a. Ms. Widenhofer asked Mr. Croff if he felt all the problems she was having were strike related. Mr. Croff responded that he felt that they were directly strike related. That the parents had indicated to Mr. Croff that they were unhappy with Ms. Widenhofer because she had gone out on strike.

"19. Mr. Frank again visited Ms. Widenhofer's classroom on February 24, 1976. Mr. Frank's only comment was to keep smiling.

"20. Mr. Croff told Ms. Widenhofer that he had to attend a school board meeting to discuss Ms. Widenhofer's evaluation. After the meeting he came into Ms. Widenhofer's classroom and told her that he had said as many positive things about her as he could, but that he did not feel that any decision had been reached at that time." (Citations to transcript omitted.)

On December 19, 1975, Ms. Widenhofer was again evaluated by Mr. Croff. The hearing examiner found that the tenor of this evaluation was negative with respect to Ms. Widenhofer's teaching performance. The evaluation contained the following comments: "You have demonstrated support for your professional organization." While Ms. Widenhofer's request for a transfer was refused by Mr. Frank, Ms. Sayler, the other Poly Drive teacher who picketed her own school, but who was tenured, received a transfer for the next school year.

At one point Mr. Croff made it clear to Ms. Widenhofer that "all of this trouble" was caused by her membership in the BEA.

On or about March 16, 1976, the School Board met and discussed the matter of the renewal of Ms. Widenhofer's employment contract. The record establishes that the school board questioned Mr. Frank and Mr. Croff closely concerning Ms. Widenhofer and their evaluations of her. Ms. Widenhofer was informed by a school board member, Ms. Heizer, that no one had been fired at the March 16, 1976, meeting. Nevertheless, the official minutes of the School District for that meeting indicate that the decision to terminate

Ms. Widenhofer's employment was made on that date. Ms. Widenhofer was notified by letter of the Board's decision on April 9, 1976. This letter stated, in part, that "[t]he reason for nonrenewal is unsatisfactory evaluations by your Principal."

The issues presented by this appeal are as follows:

I. Did the BEA meet its burden of proof requirement in establishing that an unfair labor practice had occurred?

II. Was it error for the BPA and the District Court to affirm the hearing examiner in the absence of evidence which established that the Board of Trustees of the School District knew of Ms. Widenhofer's strike activities?

III. Was it error for the hearings examiner, the BPA, and the District Court to fail to make the finding that Ms. Widenhofer's discharge would not have occurred 'but for' her protected, union activity?

Appellants are contending that there is an insufficiency of proof to show that an unfair labor practice occurred in this case. The complaint which was originally filed in this action alleged violations of section 39-31-401(1) & (3), MCA. These statutes define unfair labor practices of public employers. In the event of a charge of an unfair labor practice under these statutes the Board of Personnel Appeals must conduct a hearing. Section 39-31-405, MCA. The complainant's case must be established by a preponderance of the evidence before an unfair labor practice may be found. Section 39-31-406, MCA.

The scope of judicial review for an unfair labor practice case is provided by section 39-31-409, MCA. This statute provides, in essence, that the courts are not to substitute their judgment for that of the agency. The findings of the board as to questions of fact are conclusive if supported by substantial evidence on the record considered as a whole. Section 39-31-409(4).

In Vita Rich Dairy, Inc. v. Dept. of Business Regulations

(1976), 170 Mont. 341, 553 P.2d 980, this Court had occasion to discuss and comment upon the purposes of limited judicial review of agency decisions. Several reasons are given for the desirability of this approach. This Court summarized one of the reviewing court's functions as follows:

> "The agency's actions need a balancing check.
> In the absence of a body within the agency which
> is separated from the actual decision and in
> which all parties have confidence, a limited
> judicial inquiry to see (a) that a fair procedure
> was used, (b) that questions of law were properly
> decided and, (c) that the decision is supported
> by substantial evidence is necessary." 170 Mont.
> at 345.

> "Substantial evidence has been defined by this Court
> as such as will convince reasonable men and on
> which such men may not reasonably differ as to
> whether it establishes the plaintiff's case, and,
> if all reasonable men must conclude that the evi-
> dence does not establish such case, then it is not
> substantial evidence. The evidence may be inherently
> weak and still be deemed 'substantial', and one
> witness may be sufficient to establish the preponder-
> ance of a case." Olson v. West Fork Properties, Inc.
> (1976), 171 Mont. 154, 158, 557 P.2d 821.

In the instant case the agency decision is well documented. The references to anti-union animus of the parents and of Mr. Croff and Mr. Frank runs to several pages. Some of the more striking examples are: Mr. Frank's comments on February 3, 1976, to the effect that he could not save Ms. Widenhofer's "skin" and that everyone else was back to normal after the strike; the fact that only the detrimental letters appeared in Ms. Widenhofer's file; Mr. Croff's statements that Ms. Widenhofer's problems were all strike related; and Mr. Croff's remarks that the parents were un-happy over Ms. Widenhofer's strike activities. This evidence stands uncontradicted. There are more examples of anti-union animus, but the above examples serve the purpose of establishing substantial evidence. This Court finds that there was substantial evidence to support the finding of anti-union animus and the commission of an unfair labor practice.

The appellants allege that it was error to find an unfair

labor practice where the hearings examiner made a finding that the trustees did not know of Ms. Widenhofer's union activities. There are no Montana cases which deal with this precise point. Therefore, it is helpful to consider cases from jurisdictions which have dealt with the issue of the employer's knowledge of the employee's protected union activities. There are federal cases which discuss the knowledge requirement under §8(a)(3) of the National Labor Relations Act. 29 U.S.C. 158(a)(3). This federal statute is identical, in pertinent part, to the statute under which the instant case was brought. Section 39-31-401(3), MCA. These statutes say:

> "It shall be [is] an unfair labor practice for an [a public] employer [to]:
>
> " . . .
>
> "(3) by discrimination [discriminate] in regard to hire or tenure of employment or any term or condition of employment [in order] to encourage or discourage membership in any labor organization . . ." (Differences in Montana Act are bracketed.)

In NLRB v. Whitin Machine Works (1st Cir. 1953), 204 F.2d 883, the Court said:

> "When a charge is made that by firing an employee the employer has exceeded the lawful limits of his right to manage and to discipline, substantial evidence must be adduced to support at least three points. First, it must be shown that the employer knew that the employee was engaging in some activity protected by the Act. Second, it must be shown that the employee was discharged because he had engaged in a protected activity. (Cites omitted.) Third, it must be shown that the discharge had the effect of encouraging or discouraging membership in a labor organization. (Cites omitted.) The first and second points constitute discrimination and the practically automatic inference as to the third point results in a violation of §8(a)(3)." 204 F.2d at 884.

In the instant case, the trustees had the sole authority to hire and fire teachers. The hearings examiner found that the trustees were unaware of Ms. Widenhofer's union activities. The hearing examiner dealt with this point as follows:

> " . . . since Mr. Croff is an agent of the school board, the school board is responsible for his

behavior and having dismissed Mrs. Widenhofer
because of Mr. Croff's evaluation as was stated
in her letter of nonrenewal, they terminated Ms.
Widenhofer because of her union activity."

We hold that the appellants have committed an unfair labor practice despite the trustees' lack of knowledge of Ms. Widenhofer's union activities. Under the usual employer-employee relationship, there cannot be discrimination unless the employer knows of the protected activity. However, in the circumstances presented by this case, we are not dealing with a usual employee-employer relationship. The authority to hire or not hire is vested with the trustees, but their decision not to hire in this case was based on a tainted evaluation. The hearings examiner found a direct connection between the tainted evaluation and the decision not to hire. In other words, Ms. Widenhofer was denied employment because of her protected union activities. This violates her rights under section 39-31-401, MCA.

We reach this decision without imputing knowledge to the trustees. An anti-union act was committed when Mr. Croff presented the tainted evaluation to the trustees. The trustees are responsible for this action by Mr. Croff. They relied upon this evaluation, thereby committing the prohibited act of discrimination. They may not insulate themselves by claiming lack of knowledge. If we were not to adopt such a policy a school board could violate a public employee's rights with impunity in almost every instance. We do not believe that the legislature intended that public employees' rights should be disregarded in such a manner.

Appellant's last contention concerns the application of the correct legal test to be used in a case where the employer's motivation is a material question. The task of determining motivation is not easy, and agencies and courts must rely on the outward manifestations of the employer's subjective intent. The task is compounded in employment cases where there exist permissible

- 10 -

and impermissible reasons for a particular discharge.  This is a problem of dual motivation.

Ms. Widenhofer was a nontenured teacher.  The services of a nontenured school teacher may be terminated without cause, as long as the termination is not because of an impermissible reason.  Branch v. School District No. 7 (D.C. Mont. 1977), 432 F.Supp.608, 609.  Since no reason need be given for dismissing a nontenured teacher such as Ms. Widenhofer, the present case presents a dual motivation problem.

Courts have devised several tests to use when confronted with this problem.  The trouble with most of these tests is that employees could conceivably place themselves in a better position by engaging in protected activity than they would have been had they not engaged in such conduct.  The United States Supreme Court had occasion to address and resolve this situation in Mt. Healthy City Board of Education v. Doyle (1977), 429 U.S. 274, 97 S.Ct. 568, 50 L Ed 2d 471.

In Mt. Healthy a nontenured school teacher was fired. There were several reasons given for this action.  One of the reasons for the termination was a protected free speech activity. There were additional reasons which involved nonprotected activity and these additional reasons were adequate reasons to discharge a teacher.  The lower court held that the teacher could not be discharged because one of the reasons given involved a protected activity.  The Supreme Court reversed the lower court on the issue of motivation or causation.  The Supreme Court handled the problem as follows:

> "A rule of causation which focuses solely on
> whether protected conduct played a part, 'sub-
> stantial' or otherwise, in a decision not to
> rehire, could place an employee in a better posi-
> tion as a result of the exercise of constitutionally
> protected conduct than he would have occupied had
> he done nothing.  The difficulty with the rule
> enunciated by the District Court is that it would

- 11 -

require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principal at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

"This is especially true where, as the District Court observed was the case here, the current decision to rehire will accord 'tenure'. The long-term consequences of an award of tenure are of great moment both to the employee and the employer. They are too significant for us to hold that the Board in this case would be precluded, because it considered constitutionally protected conduct in deciding not to rehire Doyle, from attempting to prove to a trier of the fact that quite apart from such conduct Doyle's record was such that he would not have been rehired in any event.

" . . .

"Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's re-employment even in the absence of the protected conduct." 429 U.S. at 285-287.

Even though the Mt. Healthy "but for" test dealt with first amendment rights, some Federal Circuit Courts have adopted this test in labor law dual motivation cases. The First Circuit specifically adopted this test in Coletti's Furniture, Inc. v. NLRB (1st Cir. 1977), 550 F.2d 1292. This was reaffirmed in NLRB v. Rich's of Plymouth, Inc. (1st Cir. 1978), 578 F.2d 880, 887. The Second Circuit has also applied the Mt. Healthy causation test to the federal labor law field in the case of United States v.

- 12 -

Winston (2nd Cir. 1977), 558 F.2d 105, 110.

On the other hand the Fifth Circuit has refused to adopt the Mt. Healthy test in labor law cases. In Federal Mogul Corp. v. NLRB (5th Cir. 1978), 566 F.2d 1245, 1265, Thornberry, J. specially concurring, said:

> "The Supreme Court has utilized a 'but for' test in first amendment cases, e.g., Mt. Healthy City School District v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L Ed 2d 471 (1977), but that hardly means the test is appropriate in the labor context. In Mt. Healthy the Court, as it has done so often, struck a balance between competing interests. Similar competing interests exist in the labor setting, but there Congress has already established a balance by passing the labor laws. That balance favors the employee, for Congress clearly recognized the superior bargaining position of the employer. See American Shipbuilding Co. v. N.L.R.B., 380 U.S. 300, 316, 85 S.Ct. 955, 966, 13 L Ed 2d 855 (1965) (labor laws attempt to redress the 'imbalance of economic power between labor and management'). The 'but for' standard significantly restrikes this balance in favor of the employer, and such a test is contrary to Congressional policy and the case law in this Circuit."

We do not find in the Montana statutes a policy which tips the balance in favor of either the public employee or employer. The policy is stated in pertinent part, as follows:

> " . . . it is the policy of the state of Montana to encourage the practice and procedure of collective bargaining to arrive at friendly adjustment of all disputes between public employers and their employees." Section 39-31-101, MCA.

It must be noted, as it was in Federal Mogul, that the courts are attempting to balance competing interests. Mt. Healthy balanced first amendment rights against the need of a school district to be able to dismiss a person who obviously deserved to be dismissed for permissible reasons. Labor law rights under Montana law should not be given a higher degree of protection than federal first amendment rights are given. The Mt. Healthy 'but for' test is adopted for dual-motivation cases under Montana's Collective Bargaining Act. This adequately protects the interests and rights of both parties.

- 13 -

In the instant case it is not readily apparent which test the hearings examiner applied. The language used by the hearings examiner is as follows:

> " . . . it becomes clear that this Board's author-
> ity is limited to that instance where it can be
> shown that an employee was discharged for union
> activity. However, if the discharge was partially
> motivated by the employee's union activity, it is
> unlawful. Finally if there is substantial evidence
> that an employee was illegally discharged for union
> activity, then the burden is on management to show
> the reason for discharge was not union related."
> (Emphasis added.)

A comparison of this language with the following Mt. Healthy passage is instructive:

> " . . . the District Court should have gone on to
> determine whether the Board had shown by a prepon-
> derance of the evidence that it would have reached
> the same decision as to respondent's reemployment
> even in the absence of the protected conduct."
> (Emphasis added.) 429 U.S. at 287.

Even though the two passages are not identical they are saying the same thing. The hearings examiner was, in essence, using the 'but for' test.

Affirmed.

_____
Chief Justice

We concur:

_____

_____
Justices

_____
Hon. Frank E. Blair, District
Judge, sitting in place of Mr.
Justice John C. Sheehy.

_____
Justice

- 14 -