NAPOLEON EDUCATION ASSOCIATION v NAPOLEON
COMMUNITY SCHOOLS

Docket No. 62323. Submitted January 5, 1983, at Lansing.—Decided
    May 3, 1983. Leave to appeal applied for.

Petitioner, Napoleon Education Association, requested the Michi-
    gan Employment Relations Commission to make a determina-
    tion that Laura Davis, a probationary teacher, was dismissed
    from her employment with respondent, Napoleon Community
    Schools, for engaging in concerted activity protected by the
    public employment relations act. The commission decided in
    the petitioner's favor. Respondent appeals. *Held:*

    1. The commission explicitly indicated its awareness of the
    proper allocation of the burdens of both ultimate persuasion
    and production and correctly stated that the case was to be
    decided by a weighing of the evidence as a whole. The commis-
    sion properly applied the burden of ultimate persuasion.

    2. The commission's factual conclusions were supported by
    competent, material, and substantial evidence.

    3. The commission presented a sound theory based on reason-
    able inferences and record evidence supporting its conclusion.
    The great weight of the evidence does not rest with either side.
    The Court of Appeals, therefore, deferred to the commission's
    judgment.

    Affirmed.

1. LABOR RELATIONS — BURDEN OF PROOF — EMPLOYMENT RELATIONS
    COMMISSION — PROTECTED ACTIVITY.

    The burden of proof applicable to actions before the Michigan
    Employment Relations Commission wherein it is alleged that
    an employee was dismissed from employment for engaging in
    protected activity is that the charging party must make a
    prima facie showing sufficient to support the inference that

REFERENCES FOR POINTS IN HEADNOTES
[1] 21 Am Jur 2d, Administrative Law § 299.
    48 Am Jur 2d, Labor and Labor Relations §§ 1483, 1484.
[2] 2 Am Jur 2d, Administrative Law §§ 548, 748 *et seq.*
[3] 48 Am Jur 2d, Labor and Labor Relations § 43.
    48A Am Jur 2d, Labor and Labor Relations § 1830 *et seq.*

protected conduct was a "motivating factor" in the employer's decision and, once this is established, the burden shifts to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct; the employer has only the "burden of production", not the "burden of persuasion", since the full burden of proving that the protected activity was a "but for" cause of the discharge lies with the charging party; nevertheless, the distribution of such burden is relatively unimportant since such cases are to be decided by a weighing of the evidence as a whole.

2. ADMINISTRATIVE LAW — APPEAL.

The Court of Appeals will defer to a decision by the Michigan Employment Relations Commission, although it may have reached a different conclusion sitting as trier of fact, where such decision is supported by competent, material, and substantial evidence; the Court of Appeals may defer to the commission's judgment where the great weight of the evidence does not rest with either side.

3. LABOR RELATIONS — DISCHARGE OF EMPLOYEE — DUAL MOTIVES.

An employer runs the risk that its substantive reasons for an employee's discharge will be weighed and found to be insufficient to merit discharge where substantive reasons alone are advanced in a "dual motives" discharge case; the absence of fairness by the employer may well affect the weight to be accorded the reasons for discharging the employee by the trier of fact.

*Foster, Swift, Collins & Coey, P.C.* (by *Deborah A. Deprez),* for petitioner.

*Thrun, Maatsch & Nordberg, P.C.* (by *Donald J. Bonato),* for respondent.

Before: ALLEN, P.J., and BRONSON and WAHLS, JJ.

BRONSON, J. Respondent appeals as of right from a determination of the Michigan Employment Relations Commission (MERC) that Laura Davis, a probationary teacher, was dismissed for engaging in concerted activity protected by § 9 of the public

employment relations act, MCL 423.201 *et seq.;* MSA 17.455(1) *et seq.* We affirm.

Respondent claims that MERC misallocated the burden of proof. Both parties agree that the commission properly considered this case to be one in which "dual motives" existed supporting the discharge of Ms. Davis. Concerning the burden of proof, the commission applied a test drawn from a decision of the National Labor Relations Board, enforced in *National Labor Relations Bd v Wright Line, A Division of Wright Line, Inc,* 662 F2d 899 (CA 1, 1981). The commission quoted from the NLRB's opinion:

"First, we shall require that the General Counsel make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." 251 NLRB # 150, p 1083; 150 LRRM 1169 (1980).

The commission noted, however, that:

"The First Circuit Court of Appeals, enforcing the board's order in *Wright Line,* held that the employer had only the 'burden of production', not the 'burden of persuasion', and that the full burden of proving that the protected activity was a 'but for' cause of the discharge lay with the NLRB's General Counsel. The Court stated, however, that in its view the distribution of the burden was relatively unimportant since the cases were to be decided by a weighing of the evidence as a whole."

In its lengthy opinion, the commission carefully analyzed the facts. It stated:

"Applying the *Wright Line* test, in this case, we find that the charging party met its burden of demonstrating that Davis's grievance and her signing of the Dreyer letter were motivating factors in Harrison's decision to terminate her. Harrison had acquired a negative opinion of Davis's attitude prior to her filing the November grievance or signing the Dreyer letter. He felt that her complaints about her individual working conditions indicated a lack of proper enthusiasm for her work. He also saw her as overreacting to minor incidents, and he disliked the emotional tone of some of her communications. As noted above, however, it was not alleged here that Davis's protected activities were the sole motivating factors in her termination. Although Harrision argues that he had no hostility toward the grievance process per se, it was clear that Harrison's professional evaluation of Davis was influenced by the fact that she had asserted her rights under the collective-bargaining agreement and had pursued them by means of the grievance procedure. Harrison testified that Davis was the first probationary teacher, in his personal experience as an administrator within the school district, to file a grievance.

"The 'discontent and irritation' which Harrison cited in his unsatisfactory final evaluation obviously referred in large part to Davis's complaints about her hours and her preparation time. We find in this case that Harrison's repeated references to Davis's grievance as evidence of her poor attitude demonstrated that the grievance had merged in his mind with other evidence of what he saw as her 'attitudinal' problems.

"Harrison did not specifically refer to the Dreyer letter as evidence of Davis's poor attitude. Nevertheless, there was evidence that Harrison was upset by this letter criticizing him, when he brought up the subject in the February meeting with Davis. According to Harrison, this meeting was for the purpose of notifying Davis of the serious problems which were to lead to her termination. If Davis is credited, Harrison expressed surprise at her signing the Dreyer letter as a non-tenured teacher. Harrison himself admits that he asked 'how she felt about the Dreyer situation', to which Davis allegedly replied that she felt strongly about it,

and when she felt strongly, she had to speak out. According to the union, respondent's assistant superintendent later criticized the union for not 'warning' Davis, as a probationary teacher, not to sign the letter since it was viewed 'negatively'.

"The evidence in this case is sufficient to persuade us that the signing of the Dreyer letter was also evidence, in Harrison's mind, of Davis's poor attitude, and that it was a motivating factor in the decision to terminate her. Davis was apparently a competent librarian. She had been rated well on her ability to work with students, library aides, and other teachers. Testimony was that use of the library went up significantly during Davis's tenure, despite alleged lack of enthusiasm. According to the respondent's own testimony, the decision to terminate Davis rested solely on Harrison's unfavorable evaluation of her 'attitude'. Moreover, although Harrison noted his 'communication problem' with Davis in her evaluation in November, there was no indication in this evaluation that Harrison considered her continued employment to be in question. By April, however, Davis had been typed in Harrison's mind as a troublemaker.

"Respondent argued that the significant event which had changed Harrison's mind about the renewal of Davis's contract was the *Glamour* magazine incident which occurred in January, 1980. Harrison and members of the school board testified credibly that the community of Napoleon is especially sensitive to the content of materials in the school library. Harrison stated that he was 'shocked' at Davis's comment that she saw nothing wrong with the *Glamour* article he gave her to read. He also testified that the incident made him doubt her ability to select materials for the library. There was no evidence, however, that prior to the January incident Davis had been alerted to the need to be especially sensitive to the content of materials in the library. There was no evidence that Davis had been given any guidelines for determining what materials would be acceptable to the community, or that she, if given such guidelines, would be incapable of following them. The *Glamour* magazine subscription had apparently been in the library for many years,

along with many other magazines. Davis had no special reason to suspect that material contained in the magazine was improper. There was no indication that Davis had personally selected any objectionable materials, or that she failed to remove any remaining objectionable materials from the library after the January incident.

"Harrison also indicated that he felt that Davis's memo regarding the *Glamour* article was borderline insubordination. He did not contend, however, that Davis refused or resisted his order to cancel *Glamour* and other selected magazine subscriptions. The memo in its original form cannot be construed as insubordination since it merely suggests a compromise to eliminate the objectionable material while keeping the rest of the magazine available to the students.

"Under the *Wright Line* test, after the charging party has demonstrated that protected activities were a motivating factor in the discharge, an employer must then show that the discharge would have occurred in the absence of the protected activity. We find that respondent has not met its burden in this case. We note that we do not construe respondent's burden to be merely that of showing that conduct occurred which, in other circumstances, might have led to a termination.

"Respondent in this case has the burden of demonstrating that, in fact, the discharge would have occurred even in the absence of protected activity. In this case, respondent did not present evidence of gross misconduct or incompetence of the kind which normally would lead to termination. There was no evidence concerning respondent's treatment of other probationary employees, or the standards normally used by respondent to evaluate the qualifications of these employees. There was, therefore, no basis for comparing respondent's treatment of Davis with that of probationary employees not engaged in protected activities. Considering the evidence taken as a whole, we cannot conclude that Davis's protected activities, which were motivating factors in the decision to terminate her, were not in fact the 'but for' causes of her termination."

Although phrases can be extracted from the opin-

ion which suggest that the commission may have misallocated the burden of ultimate persuasion, a review of the entire opinion indicates otherwise. Although the employer presented evidence showing reasons for dissatisfaction with Ms. Davis's conduct other than her protected activity, no evidence was presented to indicate that the district normally terminated probationary teachers who merely expressed dissatisfaction or disenchantment with school policies. In the total absence of proof that Ms. Davis's performance of her job duties was in any way unsatisfactory, such evidence was important to rebut petitioner's prima facie case. The commission's opinion reflects a conclusion that respondent failed to meet its burden of producing such evidence. In the absence of evidence showing a pattern of terminations due to "attitudinal concerns" only, it is understandable that the commission would discount respondent's claim that Ms. Davis would have been dismissed even if she had not engaged in protected activity. The commission explicitly indicated its awareness of the proper allocation of the burdens of both ultimate persuasion and production. It also correctly stated that "the cases were to be decided by a weighing of the evidence as a whole". Our review of its entire opinion convinces us that it properly applied the burden of ultimate persuasion. Its references to respondent's failure to meet its burden were references to respondent's burden of production.

Respondent also claims that competent, material, and substantial evidence did not support the commission's decision. Although we have reviewed the entire record independently, we are grateful for the comprehensive opinions of the commission and its hearing officer and the well-organized arguments of counsel.

Although we might have reached a different conclusion sitting as trier of fact, the commission's factual conclusions were supported by competent, material, and substantial evidence. Specifically, the commission's decision to focus on the conduct and knowledge of the school administration, rather than that of the school board itself, was the result of a reasonable inference which was not dispelled by evidence presented by the district. Appellant's claims are addressed primarily to the commission's weighing of the evidence. Reasonable minds could easily differ on the weight to be given the various reasons (all of which were quite subjective) for dissatisfaction with Ms. Davis's conduct.

We agree with appellant that the district was free to discharge Ms. Davis for subjective reasons. When subjective reasons alone are advanced in a "dual motives" case, however, an employer runs the risk that they will be weighed and found to be insufficient to merit discharge. The district, in this case, presented little or no evidence showing its usual reliance on subjective judgments about attitude in making decisions to terminate probationary employees. The district argues that it was free to be unfair. We agree, but the absence of fairness may well affect the weight to be accorded reasons for discharging an employee by a finder of fact.

In the present case, MERC chose between differing views, both of which appear to have reasonable support in the record. Our task of reviewing MERC's findings

"must be undertaken with considerable sensitivity in order that the courts accord due deference to administrative expertise and not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views." *Michigan Employment Relations Comm v Detroit Sym-*

*phony Orchestra, Inc,* 393 Mich 116, 124; 223 NW2d 283 (1974).

MERC has presented a sound theory based on reasonable inferences and record evidence supporting its conclusion. The great weight of the evidence does not rest with either side. We, therefore, defer to MERC's judgment.

Affirmed. Costs to appellee.