HARDIN COUNTY EDUCATION ASSOCIATION, IEA-NEA, Petitioner, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.—THE BOARD OF EDUCATION OF HARDIN COUNTY COMMUNITY UNIT SCHOOL DISTRICT NO. 1, Petitioner, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District Nos. 4—87—0490, 4—87—0506 cons.

Opinion filed August 18, 1988.

Michael A. Loizzi, Jr., S. Bennet Rodick, and Robert A. Kohn, all of Gottlieb & Schwartz, of Chicago, for petitioner Board of Education of Hardin County Community Unit School District No. 1.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and William D. Frazier, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Michael A. Loizzi, Jr., S. Bennet Rodick, and Marc R. Jacobs, all of Gottlieb & Schwartz, of Chicago, for respondent Hardin County Community Unit School District No. 1.

Gregory J. Malovance and Stephen S. Morrill, both of Winston & Strawn, of Chicago, and Sandra Holman, of Illinois Education Association, of Springfield, for Hardin County Education Association.

JUSTICE SPITZ delivered the opinion of the court:

The Hardin County Education Association, IEA-NEA (Association or union), seeks review of the June 17, 1987, opinion and order of the Illinois Educational Labor Relations Board (IELRB or Labor Board), finding that the Board of Education of Hardin County Community Unit School District No. 1 (District or Board) did not commit an unfair labor practice in violation of sections 14(a)(1) and 14(a)(3) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 1714(a)(3)), by dismissing art teacher Eileen Sandra Williams. The District appeals the IELRB's ruling, also issued in the June 17, 1987, opinion and order, that the District committed unfair labor practices in violation of section 14(a)(1) of the Act (Ill. Rev. Stat. 1985, ch. 48, par. 1714(a)(1)) by (1) reprimanding teacher Carol Walker, and (2) questioning counselor Linda St. Onge about her union affiliation and that of another teacher. For the reasons that follow, we affirm.

The Association filed charges with the IELRB August 27, 1985. Following an investigation, the IELRB Executive Director issued a complaint December 19, 1985, alleging the District, in dismissing Williams for engaging in protected and concerted activity, violated sections 14(a)(1) and 14(a)(3) of the Act. The complaint also alleged a formal reprimand given to Walker and the questioning of St. Onge violated section 14(a)(1) of the Act. Following hearings March 17, 18, and 19, 1986, the IELRB hearing officer issued his recommended decision and order August 29, 1986. *Hardin County Education Association, IEA-NEA*, 2 Pub. Employee Rep. (Ill.) par. 1110, case No. 85—

CA—0032—S (Illinois Educational Labor Relations Board, Aug. 29, 1986) (hearing officer).

The hearing officer found the Association had established a *prima facie* case of discriminatory discharge, but ruled the District met its burden of showing the discharge would have occurred absent the protected activity. The hearing officer also found the District violated section 14(a)(1) by reprimanding Walker and questioning St. Onge. The IELRB adopted the hearing officer's findings of fact in an opinion and order issued June 17, 1987. (*Hardin County Education Association, IEA-NEA*, 3 Pub. Employee Rep. (Ill.) par. 1076, case No. 85—CA—0032—S (Illinois Educational Labor Relations Board, June 17, 1987).) Although the Labor Board affirmed the result, it differed with the hearing officer over whether the Association had made out a *prima facie* case of discriminatory discharge. It ruled no *prima facie* case had been established, and further found that even if the Association had made out a *prima facie* case, the District met its burden of showing the discharge would have occurred absent the protected activity. The Labor Board also affirmed the hearing officer's ruling that Walker's reprimand and St. Onge's questioning violated the Act. The Association and the District filed petitions for review July 22, 1987, and July 24, 1987. The cases were consolidated for review.

Given the extensive factual findings in the case, we will refer only to those facts necessary to our resolution of the issues presented. The underlying facts are set forth in the hearing officer's recommended decision and order, *Hardin County Education Association, IEA-NEA*, 2 Pub. Employee Rep. (Ill.) par. 1110, case No. 85—CA—0032—S (Illinois Educational Labor Relations Board, Aug. 29, 1986) (hearing officer), and were adopted by the IELRB. *Hardin County Education Association, IEA-NEA*, 3 Pub. Employee Rep. (Ill.) par. 1076, case No. 85—CA—0032—S (Illinois Educational Labor Relations Board, June 17, 1987).

### A. WILLIAMS' DISMISSAL

The Association urges this court on appeal to adopt an "in part" test in section 14(a)(3) cases rather than the "but for" test applied by the hearing officer and the Labor Board. The Association also argues the IELRB's decision upholding Williams' dismissal is against the manifest weight of the evidence. The District and the IELRB contend the Labor Board's decision is supported by the evidence.

■ As a general rule, courts will accord deference to the interpretation placed on a statute by the agency charged with its administration and enforcement. (*Blum v. Bacon* (1982), 457 U.S. 132, 141,

72 L. Ed. 2d 728, 736, 102 S. Ct. 2355, 2361; *Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 536, 508 N.E.2d 1058, 1062.) An administrative agency's interpretation is not binding, however, and it will be rejected when it is erroneous. *Securities Industry Association v. Board of Governors* (1984), 468 U.S. 137, 142-43, 82 L. Ed. 2d 107, 113, 104 S. Ct. 2979, 2982; *Northern Trust Co. v. Bernardi* (1987), 115 Ill. 2d 354, 365, 504 N.E.2d 89, 94.

■ The decisions of the National Labor Relations Board (NLRB) and the Federal courts interpreting similar provisions under the National Labor Relations Act (NLRA) (29 U.S.C. §151 *et seq.* (1982)) are persuasive authority. The Labor Board is not, however, bound to interpret the Act as the NLRB or the Federal courts have interpreted the NLRA. (*East Richland Education Association, IEA-NEA v. Illinois Educational Labor Relations Board* (1988), 173 Ill. App. 3d 878, 902.) Nevertheless, we find the interpretation and approach stated by the Board in its decision here is essentially in agreement with NLRB precedent.

■ We first address the test applied by the hearing officer and the IELRB. In concluding the District did not violate section 14(a)(3) by discharging Williams, the hearing officer applied a "but for" test adopted by the IELRB in *Balyki Education Association, IEA/NEA*, 2 Pub. Employee Rep. (Ill.) par. 1047, case No. 84—CA—0018 (Illinois Educational Labor Relations Board, Mar. 11, 1986). In *Balyki*, the IELRB held that once the complaining party established a *prima facie* case of discriminatory discharge, the burden of proof shifted to the employer to demonstrate by a preponderance of the evidence that the discharge occurred for legitimate reasons. This allocation of the burden of proof, as applied to cases under the NLRA (29 U.S.C. §151 *et seq.* (1982)), originated in *Wright Line, a Division of Wright Line, Inc.* (1980), 251 N.L.R.B. 1083, 105 L.R.R.M. 1169, *enforced* (1st Cir. 1981), 662 F.2d 899, 108 L.R.R.M. 2513, *cert. denied* (1982), 455 U.S. 989, 71 L. Ed. 2d 848, 102 S. Ct. 1612, and approved in *NLRB v. Transportation Management Corp.* (1983), 462 U.S. 393, 400-01, 76 L. Ed. 2d 667, 674-75, 103 S. Ct. 2469, 2473-74.

In *Wright Line*, the NLRB expressed dissatisfaction with tests which had evolved to analyze the relationship between the employee's protected conduct and the employer's action. In *Wright Line*, the NLRB expressly rejected the "in part" test, under which a discharge was improper if it was motivated, even in part, by opposition to the exercise of rights protected under the NLRA, even if a legitimate business reason was also relied upon. This test had come under attack for its inability, in dual motivation cases, to resolve the conflict be-

tween the employer's legitimate right to enforce its own rules and the employee's right to participate in protected activities without fear of employer retaliation. Under the "in part" test, the employer's legitimate business reason for discharge would be irrelevant, at least to the determination of whether an unfair labor practice has been committed, once the employee established employer hostility toward the union. See *Wright Line*, 251 N.L.R.B. at 1084, 105 L.R.R.M. at 1170-71.

The NLRB found the interests of employer and employee best served by a test akin to the two-part test formulated by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle* (1977), 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568. That test, applied in the context of a first amendment challenge, required the employee to establish the protected conduct was a substantial or motivating factor in the discharge. Once this was established, the burden shifted to the employer to demonstrate it would have reached the same decision absent the protected conduct. The NLRB reasoned the test protected both parties. The employee only had to show that protected activities played a part in the decision to discharge. The employer was allowed to show it would have dismissed the employee for reasons unrelated to protected activity. *Wright Line*, 251 N.L.R.B at 1089, 105 L.R.R.M. at 1174-75.

In enforcing the NLRB's order, the First Circuit Court of Appeals agreed with the NLRB's allocation of the burden of proof. It recognized the difficulty of pinpointing the causal link between the protected activity and the employee's dismissal. The court reasoned that the most accurate method of deciding the issue was to determine whether the discharge would have occurred "but for" the protected activity. *Wright Line*, 662 F.2d at 903, 108 L.R.R.M. at 2516.

The court noted the "in part" test ran the risk of immunizing employees engaging in protected activity from otherwise unforgivable conduct once antiunion animus had been established. The "in part" test would result in a violation if the discharge was even partially motivated by opposition to union membership. In effect, it would put the employee in a better position than he would have held had he not engaged in protected activity. The NLRB found the better approach was to look at the actual cause of the dismissal, and if the discharge would have occurred absent the protected activity, no unfair labor practice was committed. (*Wright Line*, 662 F.2d at 902, 108 L.R.R.M. at 2516.) While the complainant in such cases retains the burden of proving the elements of an unfair labor practice, the employer carries the burden of proof by a preponderance of the evidence to show the discharge would have occurred absent the protected activity. See *NLRB v.*

*Transportation Management Corp.* (1983), 462 U.S. 393, 400-01, 76 L. Ed. 2d 667, 674-75, 103 S. Ct. 2469, 2473-74 (approving the *Wright Line* test).

The Association cites a number of pre-*Wright Line* cases in support of the "in part" test. These cases are inapposite. However, the Association correctly states the Supreme Court of Wisconsin has adopted the "in part" test. In *Muskego-Norway Consolidated Schools Joint School District No. 9 v. Wisconsin Employment Relations Board* (1967), 35 Wis. 2d 540, 151 N.W.2d 617, 63 L.R.R.M. 2376, the employment relations board found the primary motivation for the school district's refusal to renew a teacher's contract was his union activity; the supreme court, reversing the trial court, affirmed the agency's finding of unfair labor practice in view of statutory standard of review and the deference to be accorded agency findings. The *Muskego* court based its reasoning on a pre-*Wright Line* case, *NLRB v. Great Eastern Color Lithographic Corp.* (2d Cir. 1962), 309 F.2d 352, 355, 51 L.R.R.M. 2410, 2412, *cert. denied* (1963), 373 U.S. 950, 10 L. Ed. 2d 705, 83 S. Ct. 1680. *Muskego* was most recently affirmed in *Wisconsin Department of Employment Relations v. Wisconsin Employment Relations Comm'n* (1985), 122 Wis. 2d 132, 361 N.W.2d 660 (District 1199W/United Professionals for Quality Health Care, complainant). In the latter case, the Wisconsin Supreme Court expressly rejected *Wright Line* in favor of the "in part" test. It looked to Wisconsin's long history of "fostering a favorable climate for labor unions," and the advantage the *Wright Line* test gives to the employer, in determining that the "in part" test better effectuated the purposes of Wisconsin's State Employment Labor Relations Act. (*Wisconsin Department of Employment Relations*, 122 Wis. 2d at 142, 361 N.W.2d at 665.) The court found that to allow employers to exhibit union hostility and dismiss employees for union activity as long as the company could furnish a legitimate reason for discharge would "disrupt the relative balance between management and labor that [Wisconsin] strives for." (*Wisconsin Department of Employment Relations*, 122 Wis. 2d at 142, 361 N.W.2d at 665.) However, despite its reliance on the "in part" test, the court ruled evidence of the employer's legitimate reasons for discharge would not be excluded, but considered with all of the employee's evidence in determining the employer's motive. (122 Wis. 2d at 142-43, 361 N.W.2d at 665.) Our supreme court has not yet considered the *Wright Line* test.

■ In affirming the IELRB's adoption of the *Wright Line* test in discriminatory discharge cases under section 14(a)(3) of the Act, we recognize the test as an appropriate method of balancing the compet-

ing interests of the employer and employee in such cases. The Second District in *Rockford Township Highway Department v. Illinois State Labor Relations Board* (1987), 153 Ill. App. 3d 863, 506 N.E.2d 390, citing *Transportation Management,* which approved the *Wright Line* test, affirmed adoption of *Wright Line*'s allocation of the burden of proof in a dual motive case involving alleged unlawful discharge under section 10(a)(2) of the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, par. 1610(a)(2)).

The supreme courts of Maine and New Jersey have embraced this test. (*Maine State Employees Association v. State Development Office* (Me. 1985), 499 A.2d 165 (affirming application of *Wright Line* in cases under Maine's State Employees Labor Relations Act); *In re Township of Bridgewater* (1984), 95 N.J. 235, 471 A.2d 1 (affirming application of *Wright Line* in cases brought pursuant to New Jersey's Employer-Employee Relations Act).) The California Supreme Court has ruled *Wright Line* is to be applied in dual motive cases brought under that State's Agricultural Labor Relations Act. (*Martori Brothers Distributors v. Agricultural Labor Relations Board* (1981), 29 Cal. 3d 721, 631 P.2d 60, 175 Cal. Rptr. 626 (ALRB statutorily required to apply applicable NLRB precedent (Cal. Labor Code §1148 (Deering 1976))).) The Montana Supreme Court adopted the "but for" test in a pre-*Wright Line* case under that State's public employee collective bargaining act. *Board of Trustees of Billings School District No. 2 v. State of Montana ex rel. Board of Personnel Appeals* (1979), 185 Mont. 89, 604 P.2d 770, 103 L.R.R.M. 3090.

The California Court of Appeals has applied the *Wright Line* test in cases involving public and educational employees. (*Short v. Nevada Joint Union High School District* (1985), 163 Cal. App. 3d 1087, 210 Cal. Rptr. 297 (breach of contract action resulting from dismissal of security guard); *McPherson v. Public Employment Relations Board* (1987), 189 Cal. App. 3d 293, 234 Cal. Rptr. 428 (affirming application of *Wright Line* in cases under Educational Employment Relations Act).) In addition, State appellate courts in Florida, Iowa, Michigan, and Washington have utilized this test in cases involving public and educational employees. *Pasco County School Board v. Florida Public Employees Relations Comm'n* (Fla. App. 1977), 353 So. 2d 108, 96 L.R.R.M. 3347 (adopted *Mt. Healthy* "but for" test in pre-*Wright Line* discharge case under Florida Public Employees Relations Act); *Columbia County Board v. Public Employees Relations Comm'n* (Fla. App. 1977), 353 So. 2d 127, 96 L.R.R.M. 3345 (applying "but for" test in pre-*Wright Line* discharge case under Florida Public Employees Relations Act); *Valley Educational Support Personnel Association*

*v. Public Employment Relations Board* (Iowa App. 1988), 420 N.W.2d 495; *Ross v. Public Employment Relations Board* (Iowa App. 1987), 417 N.W.2d 475; *Cerro Gordo County v. Public Employment Relations Board* (Iowa App. 1986), 395 N.W.2d 672; *Napoleon Education Association v. Napoleon Community Schools* (1983), 125 Mich. App. 398, 336 N.W.2d 481; *Michigan Educational Support Personnel Association v. Evart Public Schools* (1983), 125 Mich. App. 71, 336 N.W.2d 235; *Highline Community College v. Higher Education Personnel Board* (1986), 45 Wash. App. 803, 727 P.2d 990; *Clallam County v. Washington State Public Employment Relations Comm'n* (1986), 43 Wash. App. 589, 719 P.2d 140; *Washington Public Employees Association v. Community College District 9* (1982), 31 Wash. App. 203, 642 P.2d 1248, 114 L.R.R.M. 2762.

We therefore hold that the *Wright Line* test is to be applied in discriminatory discharge cases brought under section 14(a)(3) of the Act.

We now turn to the issue of Williams' dismissal. The Association challenges as against the manifest weight of the evidence the Labor Board's ruling that Williams' discharge did not violate the Act. The District and the IELRB maintain the opinion was correctly based on the evidence and should not be disturbed.

■ Upon review, findings and conclusions of the administrative agency on questions of fact are considered *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3—110; *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 391, 469 N.E.2d 1085, 1088; *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 906, 493 N.E.2d 1130, 1135-36.) Courts may not interfere with the discretionary authority vested in an administrative agency unless that authority is exercised in an arbitrary or capricious manner, or the administrative decision is contrary to the manifest weight of the evidence. *Murdy*, 103 Ill. 2d at 391, 469 N.E.2d at 1088.

■ Under section 14(a)(3) educational employers are prohibited from:

> "Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employee organization." Ill. Rev. Stat. 1985, ch. 48, par. 1714(a)(3).

■ The Labor Board has held that in order to establish a *prima facie* case of discriminatory discharge the complainant must show (1) the employee engaged in activity protected under section 14(a)(3) of the Act; (2) the District was aware of that activity; and (3) the em-

ployee was discharged for engaging in that activity. (*Hardin County Education Association, IEA-NEA*, 3 Pub. Employee Rep. (Ill.) par. 1076, case No. 85—CA—0032—S, at VII—221 (Illinois Educational Labor Relations Board, June 17, 1987), citing *Balyki Education Association, IEA/NEA*, 2 Pub. Employee Rep. (Ill.) par. 1047, case No. 84—CA—0018 (Illinois Educational Labor Relations Board, Mar. 11, 1986).) Once the complainant has made this showing, the burden shifts to the employer to demonstrate by a preponderance of the evidence that the same action would have taken place even in the absence of the protected activity.

The facts relevant to our disposition of this case show Williams joined the Association at the beginning of the 1981-82 school year. She became a union steward on her side of the building, a position she held while employed by the District. As steward, she was responsible for informing members about meetings, though she did not represent employees in their grievances.

During a November 1981 Board meeting at which Association recognition was discussed, signed authorization cards were passed among Board members. A Board member said he was surprised at the number of teachers, especially nontenured teachers, who signed cards. In the latter category, Williams' name was mentioned along with band director Weltie. In the summer of 1981 during a conversation at Williams' home, Board member John Winders told Williams he wanted to give her some information on the people she was "running with." He told her if she wanted to get tenure, to stay away from that "troublemaking" bunch of people. When she asked Winders which people he was referring to, he mentioned Association president Sandra Jerrells.

Glenn Ozee, a Board member from 1981 to 1985, and the sole vote against Williams' dismissal, testified he had heard union officials called "troublemakers" many times. During a Board meeting in 1981, Ozee heard Winders state Williams would be all right if she would stay away from "that group of troublemakers." Ozee perceived the term "troublemaker" to mean a union member. In November or December of 1981, Ozee talked with Winders "at the side of the road" in which Winders said half the problems with the school were caused by the union and Jerrells.

Board member Donald Hastie said, right after his Board term began in 1983, that things would run smoother without the union. Board president Gary Carr made a number of derogatory comments about the Association, including the term "troublemaker," at regular and closed meetings and informal discussions. Board member Dale Haney said prior to Association recognition that if the union came in, it

would want to run things. Board members Jerry Fricker and Joe Daymon said nothing derogatory about the union.

The Labor Board found that Williams' career with the District was plagued early on by problems in administering discipline. During the first three years of her employment, she taught grade school pupils under the supervision of principal Wendell Robinson and junior high and high school students under the supervision of principal Donald Joyner. In Williams' first year of teaching, 1980-81, Robinson was frequently called upon by Williams to discipline unruly students. He observed she had difficulties in controlling her students, especially in the 5th and 6th grades. Some of her methods of punishment, such as assigning students to write sentences over and over, were controversial and prompted parents to complain to Robinson. Williams did not believe in corporal punishment, which she was allowed to administer, and she did not approve of giving detentions, since the detention had to be served during the student's lunch period.

Robinson evaluated Williams in March 1981 based on his observations. He stated her discipline had improved, but needed further improvement, suggesting an anticipated decreased classload would help. During Williams' second year, 1981-82, she showed some improvement, though class control remained a problem. Robinson's December 1981 evaluation indicated the quality of discipline and judgment concerning the types and amounts of discipline to be imposed had improved since the previous year. Robinson observed good discipline during his visits to Williams' classroom.

Joyner observed Williams on several occasions during her second year of teaching. Her discipline would periodically improve, then deteriorate. She often requested assistance from Joyner or assistant principal Bill Leonburger via the school intercom. Joyner's November 1981 evaluation showed improvement in discipline, in part due to the reduced size of the classes.

At the conclusion of the 1981-82 school year, the District placed Williams on probation for an additional year. The District stated the reasons for its actions were Williams' weak discipline, poor working relationship with administrators, and poor attitude toward work assignment. She was advised she could improve by not relying on supervisors to remedy a problem that the teacher could correct. The letter stated Williams should exercise better judgment when issuing discipline, stop making demands, and refrain from accusing administrators of dishonesty because her teaching schedule was not what she desired. The letter stated Williams should stop complaining and develop a positive attitude regarding an assignment once it was made.

During her first three years of employment, Williams had frequently complained that her schedule required her to move from one wing of the building to the other to teach her art classes. At the end of the 1982-83 school year, Williams was given a choice of teaching grade school or high school. She chose to teach at the high school level. In a letter dated March 24, 1983, the District informed Williams it was reducing her hours from full time to half time due to "the number of students to be enrolled in the art program." The record on appeal does not indicate whether Williams was evaluated during the 1982-83 school year, her last as a full-time teacher.

In her final year with the District, 1984-85, Steven Karraker was hired as assistant principal of the high school and principal of the junior high. He was Williams' immediate supervisor. Karraker received frequent calls on the intercom from Williams to assist with discipline. Sometimes the calls came daily. The frequency of Williams' calls for assistance was confirmed by Susie Belford, a secretary at the school, who worked within earshot of the office intercom.

The events resulting in this unfair labor practice claim began in November 1984, when Karraker gave some students keys to Williams' storage room to obtain supplies at Homecoming. Williams was not at work at the time. Williams later confronted Karraker about the resulting condition of the storage room and the fact she was responsible for accounting for supplies. Williams brought this incident to Association president Jerrells' attention.

Williams also talked to Jerrells during the 1984-85 school year about working conditions in her art room, and particularly the inoperative kiln. At the end of the previous school year, at District Superintendent Neal Cole's request, teachers made out lists of items needing attention in their classrooms. Williams' list generally concerned the kiln, the need for more shelving, the lack of proper drying racks for artwork, the absence of shades at the windows, and the need for an exhaust fan.

In March of 1985, Williams requested a day of professional leave to attend an art workshop in Charleston, Illinois. This request was denied by Joyner, after conferring with Superintendent Cole, because the workshop was too far away. Williams complained to Association president Jerrells. Williams subsequently attended an art seminar in Carbondale.

On March 4, 1985, Karraker and Williams had a confrontation involving Williams' son, Barry, who was a student at the high school. Barry was overheard by Susie Belford, an office secretary at the school, calling his mother at home to request permission to leave

school with some friends. Williams subsequently called the school and reported Barry ill. Karraker treated the incident as a truancy. He also approached Williams in the copying room at school and stated his displeasure with Williams' role in the matter. Williams brought the incident to Jerrells' attention. Williams, Jerrells, Karraker, and Cole met to discuss the matter March 19, 1985. A letter dated March 19, 1985, concerning the incident was placed in Williams' file.

During that month, Jerrells discussed with Karraker Williams' complaints about the kiln and the storage room incident of November 1984. She also talked to Joyner about denial of the workshop request.

At the March 14, 1985, Board meeting, Karraker and Joyner recommended Williams not be rehired. The Board took a preliminary vote in favor of dismissal, but decided to give Williams an opportunity to resign before final action was taken. Williams declined. The Board voted not to rehire her March 21, 1985. Ozee's vote was the only one against dismissal. Board member Haney was not present. The instant proceedings followed.

In determining the discharge was based on protected activity, the hearing officer relied largely on the various uncontradicted statements critical of the union, Association president Sandra Jerrells, and Williams' association with Jerrells. The hearing officer also noted the discharge occurred not long after Williams began complaining about working conditions in her art room. However, the IELRB found the evidence of union animus "remote in time" from Williams' discharge and lacking substantiation as to date, time, place, and context. The Labor Board, with one dissenting member, characterized these comments as isolated with little probative value as to the District's motive at the time it dismissed Williams. It ruled no *prima facie* case had been established, but had the Association done so, the District met its burden of proving Williams would have been dismissed even if she had not engaged in protected activity.

■ Based on the record as a whole, we cannot say the evidence establishes the District's decision to discharge Williams was motivated by antiunion animus, or that her protected activity was a substantial or motivating factor in her dismissal. We agree with the Board's conclusion the Association here failed to establish a *prima facie* case.

Our analysis focuses on the third element of the *prima facie* case. The employee must establish the discharge was based on antiunion animus, which is another way of saying the protected conduct must have been a motivating or substantial reason for the employer's action. See *Transportation Management*, 462 U.S. at 401, 76 L. Ed. 2d at 675, 103 S. Ct. at 2474.

The IELRB characterized as isolated with little probative value the remarks of Board members relied upon by the hearing officer to support his finding of antiunion animus. The Labor Board found these comments too remote and poorly substantiated. The Labor Board found Winders' comments to Williams in 1981 the strongest evidence of antiunion animus, but they were not enough to support a finding of antiunion motivation, since they occurred nearly four years prior to the dismissal. The Labor Board noted that the easiest time to fire Williams for her union activity would have been at the end of her probationary period. The fact Williams' probation was extended at the end of the 1981-82 school year may suggest no antiunion bias existed at that time despite the fact Williams was active in the union. However, it sheds no light on whether antiunion animus existed at the time of Williams' dismissal in March 1985.

It is undisputed that several Board members who were on the Board at the time the union received recognition were Board members at the time of Williams' dismissal. Former Board member Glenn Ozee testified to several incidents in 1980-81 in which antiunion comments were made by Board members at a time when the Association was seeking recognition as the collective-bargaining representative of teachers employed by the District. Ozee testified that several Board members referred to union members and the Association president, Sandra Jerrells, as "troublemakers." The Association cites *L. C. Cassidy & Son, Inc.* (1984), 272 N.L.R.B. 123, 125, 117 L.R.R.M. 1259, for the proposition that to use the term "troublemaker" to describe an employee associated with the union clearly constitutes evidence of unlawful animus. In *Cassidy*, the employer also threatened to fire the "troublemaking" employee, which threat is not present in the instant case. However, the use of euphemisms such as "troublemakers" has been deemed indicative of an unlawful motive. *Nor-Cal Security* (1984), 270 N.L.R.B. 543, 551, 117 L.R.R.M. 1112, citing *K & E Bus Lines, Inc.* (1981), 255 N.L.R.B. 1022, 107 L.R.R.M. 1239; *Roadway Express, Inc.* (1978), 239 N.L.R.B. 653, 100 L.R.R.M. 1046, *enforcement granted in part & denied in part* (7th Cir. 1979), 624 F.2d 1103 (unpublished opinion); *NLRB v. Hertz Corp.* (5th Cir. 1971), 449 F.2d 711, 78 L.R.R.M. 2569). *Cf. Perth Amboy General Hospital* (1986), 279 N.L.R.B. No. 10, 122 L.R.R.M. 1185 (use of "troublemaker" found coercive in section 8(a)(1) case under NLRA; "totality of circumstances" test applied).

■ We reject the Association's claim that *Balyki* stands for the proposition that the independent section 14(a)(1) violations with respect to Walker and St. Onge manifest a union animus with respect to

Williams' dismissal. In *Balyki*, a section 14(a)(3) violation constituted two section 14(a)(1) violations. One was a derivative section 14(a)(1) violation, since, by definition, to fire someone for engaging in protected activity interferes with that right. The IELRB also ruled that the act of dismissing the employee was designed to interfere with the employee's right to organize, and as such, constituted an independent section 14(a)(1) violation.

Other cases cited by the Association involved situations in which the section 14(a)(1) violations occurred prior to the discharge, in the context of active union organization campaigns and active employer resistance. That is not the case here. The Association also relies on *United Brotherhood of Carpenters & Joiners Local 1780* (1979), 244 N.L.R.B. 277, 102 L.R.R.M. 1150 (NLRB rejected ALJ's conclusion that employer did not refuse to bargain under the NLRA). There, the employer's threats to employees away from the bargaining table were found to independently violate section 8(a)(1) of the NLRA (see 29 U.S.C. §158(a)(1) (1982)), which is analagous to section 14(a)(1) of the Act. Viewed along with the employer's conduct at the bargaining table, under a "totality of conduct" standard, the NLRB found the respondent's overall approach to negotiations constituted a refusal to bargain under section 8(a)(5) of the NLRA. We need not consider the totality of the District's conduct, as the determining factor is whether the employee's protected conduct was a substantial or motivating factor in the decision to discharge.

While the Association is correct in noting a pattern of employer attitude may be evidence of motivation (see, *e.g.*, *Swan Coal Co.* (1984), 271 N.L.R.B. 862, 117 L.R.R.M. 1142; *Disposal Investment, Inc.* (1984), 271 N.L.R.B. 486, 116 L.R.R.M. 1458), the IELRB found no such pattern here. The remarks of Board members relied upon by the Association occurred nearly four years before Williams was discharged. We agree the evidence of antiunion animus was too remote to support the Association's claim of discriminatory discharge. *Cf. American National Insurance Co.* (1983), 267 N.L.R.B. 311, 114 L.R.R.M. 1029 (NLRB dismissed complaint; no union activity found at the time of discharge, and alleged antiunion animus occurred more than a year before the dismissal); *Federal Management Co.* (1982), 264 N.L.R.B. 107, 111 L.R.R.M. 1296 (general counsel failed to establish employee was unlawfully discharged in violation of NLRA; last instance of antiunion animus occurred during election five months prior to discharge, and discharge was for cause, unauthorized absence from premises); *Alcar Industries, Inc.* (1982), 260 N.L.R.B. 677, 109 L.R.R.M. 1203 (dismissing complaint; union election and accompany-

ing tension occurred nearly a year prior to incident of misconduct resulting in discharge; no antiunion motivation found).

Williams' complaints may have coincided with her dismissal. However, the IELRB has held timing alone cannot establish a *prima facie* case of discriminatory discharge. (*Hardin County Education Association, IEA-NEA*, 3 Pub. Employee Rep. (Ill.) par. 1076, case No. 85—CA—0032—S, at VII—221 (Illinois Educational Labor Relations Board, June 17, 1987), citing *Lake Zurich School District No. 95*, 1 Pub. Employee Rep. (Ill.) par. 1031, case No. 84—CA—0003 (Illinois Educational Labor Relations Board, Nov. 30, 1984) (the fact that the district considered subcontracting custodial services two months after custodial employees tried to obtain union representation was insufficient to establish a *prima facie* case absent evidence suggesting antiunion animus or a desire to frustrate union organization).) The IELRB's finding no *prima facie* case was established by the Association is not contrary to the manifest weight of the evidence.

█ The Labor Board was also justified in concluding that had the Association made out a *prima facie* case of discriminatory discharge, the District met its burden of proving by a preponderance of the evidence that Williams' discharge would have occurred absent the protected activity.

The Labor Board found this was a dual motive case in that the employer's asserted reason for the discharge, poor discipline, had merit. The Association argues the District's reason is a pretext because the District condoned Williams' conduct for at least two years and then seized upon it at the time she began complaining to Jerrells.

The existence of a period of time in which Williams was not evaluated or warned of poor performance does not necessarily raise the inference that the District seized upon the protected activity in discharging her. The evidence showed Williams was evaluated twice by Robinson and once by Joyner in 1981, Williams' second year of teaching. All three evaluations noted Williams had problems with discipline, but that they had improved and could stand more improvement. At the end of the 1981-82 year, Williams' probation was extended for poor discipline, poor working relationships with administrators, and poor attitude about her work assignments. Williams continued to teach full time until the fall of 1983, when she began teaching part time at the junior high and high school levels. The District presented uncontradicted evidence that part-time teachers were not given formal written evaluations. The Association did not show Williams had been disparately treated.

This case is unlike *Medical Center News, Inc.* (1982), 263

N.L.R.B. 1019, 111 L.R.R.M. 1559, or *Class Watch Strap Co.* (1983), 267 N.L.R.B. 276, 114 L.R.R.M. 1031, in which employees were fired for poor performance that they had never been warned about. Here, Williams was informed of needed areas of improvement in the written evaluations received in 1981. The extension of probation at the end of the 1981-82 school year hardly could have been perceived as .a condonation of Williams' teaching. No formal evaluation was performed in either of the final two years of Williams' employment. The fact the District apparently said nothing to Williams about her disciplinary problems does not extinguish its right to discipline an employee whose performance continues to deteriorate. (See *Peavey Co. v. NLRB* (7th Cir. 1981), 648 F.2d 460, 107 L.R.R.M. 2359.) The Labor Board was justified in its conclusion Williams was aware of any deficiencies in her style of discipline.

■■■ While failure to give an explanation for discharge may tend to show no legitimate motivation (*Horizon Air Services, Inc.* (1984), 272 N.L.R.B. 243, 117 L.R.R.M. 1312, *enforced* (1st Cir. 1985), 761 F.2d 22, 119 L.R.R.M. 2203), the District presented uncontroverted evidence that it was the District's policy not to give reasons for discharge to first-year or part-time teachers.

■■■ The Association is correct in stating it has been held shifting rationales can signal an unlawful discharge. (See, *e.g.*, *NLRB v. Rich's Precision Foundry, Inc.* (7th Cir. 1981), 667 F.2d 613, 626, 109 L.R.R.M. 2143; *Nor-Cal Security* (1984), 270 N.L.R.B. 543, 551, 117 L.R.R.M. 1112.) However, the Labor Board did not find the District gave shifting or inconsistent reasons for the dismissal.

As found by the IELRB, the District met its burden of proving by a preponderance of the evidence that the discharge would have taken place absent the protected activity. There is ample evidence to suggest Williams was a poor disciplinarian and, although her complaints about conditions in the art room and other matters may have reached a crescendo during the spring of 1985, the discipline problem was a long-standing one. The Labor Board's decision was not contrary to the manifest weight of the evidence.

### B. WALKER'S REPRIMAND

The District argues the IELRB's decision was against the manifest weight of the evidence because Walker's conduct was unrelated to union activity. The Association and the IELRB contend the decision was supported by the evidence.

■■■ Section 14(a)(1) states educational employers, their agents or representatives are prohibited from "[i]nterfering, restraining or co-

ercing employees in the exercise of the rights guaranteed under this Act." Ill. Rev. Stat. 1985, ch. 48, par. 1714(a)(1).

Walker met with Joyner and Karraker March 29, 1985. She was asked whether she had told students Williams had been fired due to her union activity and because her husband had run for the school board. Walker denied making the statement, and said her students had discussed the matter while coming into class. They asked her to confirm the rumors, and Walker stated rumors to that effect were "going around."

Joyner then said Walker had probably been misquoted. Both administrators told her to discourage classroom discussion on such subjects. Karraker stated the Williams dismissal had been blown out of proportion and that Williams had been discharged due to her discipline problems.

Joyner later discussed with District Superintendent Cole whether a letter should be placed in Walker's file. Cole thought a letter should be prepared, and Joyner agreed. The next school day, April 1, 1985, Joyner placed in Walker's file a letter which stated in pertinent part:

"Miss Walker, Mr. Karraker and I met on Friday, March 29, 1985. It had been reported to my office that Miss Walker made the following statement to students: 'Mrs. Eileen S. Williams was dismissed as a teacher because her husband was a Board candidate in the last Board election, and that she joined the teacher union.'

Miss Walker denied making this statement. She stated that a student or students asked her that question. Miss Walker replied that, I might have said, 'that is the rumor going around.'

*Corrections needed*:

Discussing or allowing to be discussed Board decisions of this nature is unrelated to your duties. By replying, 'that is the rumor going around,' only made the rumor grow. Your reply did nothing to nullify the rumor and might be percieved [*sic*] by some students that you agree.

Do not allow students to discuss, do not lead a discussion, or do not make statements in the presence of students that are negative in nature against Board members, administrators, co-workers or against the decisions they make.

*Copy to be filed in Miss Walkers* [*sic*] *personnel folder*." (Emphasis in original.)

The hearing officer found, and the IELRB agreed, the District went too far in placing a reprimand in Walker's file regarding her response to the student's question about the reasons for Williams' dis-

missal. Of particular importance to both decisions was the fact that Joyner told Walker she had probably been misquoted. Without further investigation and without questioning the students involved in the incident, Joyner placed a reprimand letter in Walker's file. The IELRB stated the District took action which far exceeded that needed to protect the District's legitimate interest in preventing certain discussions from taking place in front of students.

The IELRB employed the "reasonable tendency" test, which is used to determine whether an employer's conduct violates section 8(a)(1) of the NLRA. Illegality results when the conduct may reasonably be said to have a tendency to interfere with the free exercise of employee rights under the NLRA. *Radio Officers' Union v. NLRB* (1954), 347 U.S. 17, 98 L. Ed. 455, 74 S. Ct. 323; *El Rancho Market* (1978), 235 N.L.R.B. 468, 98 L.R.R.M. 1153, *enforced* (9th Cir. 1979), 603 F.2d 223, 104 L.R.R.M. 2612.

In evaluating whether the employer interfered, restrained or coerced, and whether the employer engaged in conduct which had a reasonable tendency to interfere, the reasonable construction given to the employer's comments by the listener is critical. *Impact Die Casting Corp.* (1972), 199 N.L.R.B. 268, 271, 81 L.R.R.M. 1217, *enforced* (7th Cir. 1973), 475 F.2d 1405, 84 L.R.R.M. 2128 (unpublished opinion), *cert. denied* (1973), 414 U.S. 829, 38 L. Ed. 2d 63, 94 S. Ct. 55.

The District by brief conceded the reprimand placed an affirmative duty on Walker to squelch rumors. Its assertion that the subject matter of this rumor was immaterial reveals the District to have protested too much. It is clear from the wording of the reprimand itself, and from testimony that Karraker instructed Walker to come to him with such rumors, that the subject matter was of importance to the District. The IELRB stated that the reasonable employee in Walker's position would "receive the message" that she was disciplined for the union-related content of the discussion, not the fact the discussion was with students. The Labor Board's decision is not against the manifest weight of the evidence.

### C. KARRAKER'S QUESTIONING OF ST. ONGE

The District contends the IELRB's opinion and order finding a section 14(a)(1) violation should be reversed because its conclusion was against the manifest weight of the evidence and, even if Karraker did question St. Onge, it was insufficient to constitute a section 14(a)(1) violation. The Association and the IELRB maintain that the result was correctly reached and is not against the manifest weight of the evidence.

In April or May 1985 (St. Onge was not entirely clear as to the date, but stated that this incident occurred after Williams was dismissed), Karraker approached St. Onge while both of them were on noon hour hall duty. Karraker asked St. Onge whether she belonged to the Association. St. Onge replied she did not. Karraker then asked if Jolene Odom, another teacher, was a member of the Association. Karraker stated he would like to know what was going on at Association meetings. St. Onge testified she felt Karraker wanted someone to tell him what was going on at union meetings. Karraker denied asking St. Onge if she was a union member or asking St. Onge if Jolene Odom was a union member. He denied telling St. Onge he wanted someone to inform him about what went on at union meetings.

 The hearing officer applied the "totality of circumstances test" as articulated in *Rossmore House* (1984), 269 N.L.R.B. 1176, 116 L.R.R.M. 1025, *enforced sub nom. Hotel Employees & Restaurant Employees Union, Local 11 v. NLRB* (9th Cir. 1985), 760 F.2d 1006, 119 L.R.R.M. 2624. The hearing officer concluded that a section 14(a)(1) violation occurred. The IELRB adopted the hearing officer's findings and conclusions. It stated Karraker's questions to St. Onge about her union affiliation were not casual in the atmosphere existing at the school following Williams' dismissal. Under the circumstances, Karraker's questions regarding Jolene Odom were further violations attempting to encourage St. Onge to engage in surveillance of the union.

The relevant inquiry is whether Karraker's questions had a reasonable tendency to interfere, restrain, or coerce St. Onge in the exercise of her rights guaranteed under the Act. (*Radio Officers' Union*, 347 U.S. 17, 98 L. Ed. 455, 74 S. Ct. 323; *El Rancho Market*, 235 N.L.R.B. 468, 98 L.R.R.M. 1153, *enforced* (9th Cir. 1979), 603 F.2d 223, 104 L.R.R.M. 2612.) In *Rossmore House*, the NLRB rejected a *per se* rule and adopted a test which recognized that the employer's questioning about an employee's union views is not necessarily coercive and may arise during casual conversation. In fact, the Ninth Circuit acknowledged "[e]mployers often mingle with their employees, and union activities are a natural topic of conversation." (*Rossmore House*, 760 F.2d at 1009, 119 L.R.R.M. at 2627.) Courts have held that factors to be considered in determining coerciveness include (1) background, (2) nature of the information sought, (3) identity of the questioner, and (4) the place and method of interrogation. Questions related to protected activity tend to interfere even outside the context of a union organizing campaign. See *Club Monte Carlo Corp.* (1986), 280 N.L.R.B. No. 30, 122 L.R.R.M. 1208 (NLRB found employer's

questions to employees were unlawful when intended to elicit identity of employee who led coworkers in protected activity).

■■■ Under the totality of the circumstances test, we find no basis· for reversing the Labor Board's finding that Karraker's questions about St. Onge's union activity tended to interfere within the meaning of the Act. Karraker was St. Onge's immediate supervisor. The questioning occurred around the time Williams was dismissed. The type of information sought was whether or not St. Onge was a member of the union. Although the District characterizes the conversation as casual because it occurred in a hallway, the record clearly shows St. Onge was on noon hall duty, as was Karraker. Therefore, St. Onge was on the job with her supervisor. There is no evidence Karraker's questions were made in a joking or casual manner (*Long-Airdox Co.* (1985), 277 N.L.R.B. 1157, 121 L.R.R.M. 1092), or in jest (*La-Z-Boy* (1986), 281 N.L.R.B. No. 54, 123 L.R.R.M. 1205). Karraker's questions were not shown to be rhetorical. (*Benham Corp.* (1987), 284 N.L.R.B. No. 64, 125 L.R.R.M. 1221.) Absent any such indications, the IELRB could properly find this was not a casual conversation.

The District's reliance on *Sunnyvale Medical Clinic, Inc.* (1985), 277 N.L.R.B. 1217, 121 L.R.R.M. 1025, is misplaced. The employer's questioning in *Sunnyvale* was found noncoercive under the *Rossmore House* test in part because the employee made the employer aware of her union sympathies. The questioning challenged in *Sunnyvale* occurred between the employer's personnel director and the employee immediately after the employee presented the personnel director with a signed card authorizing the deduction of union dues. The NLRB agreed with the administrative law judge that no history of employer hostility existed. The questions were of a general and nonthreatening nature, and the participants in the amicable conversation had a friendly relationship. Here, Karraker's own question to St. Onge indicates he did not know whether St. Onge belonged to the union. The context in which the questioning occurred was sufficiently distinguishable from that in *Sunnyvale* to support the IELRB's finding.

■■■ As to the questioning about Jolene Odom, it is well settled that asking an employee to inform a supervisor about union activities of other employees is coercive. (*Garrison Valley Center, Inc.* (1985), 277 N.L.R.B. 1422, 121 L.R.R.M. 1178; *So-Cal Products, Inc.* (1985), 273 N.L.R.B. 1486, 118 L.R.R.M. 1288; *Abex Corp.* (1966), 162 N.L.R.B. 328, 64 L.R.R.M. 1004 (NLRB rejected trial examiner's finding the questioning•was casual and therefore not unlawful).) Karraker's statement may not have risen to the level of an outright instruction to act as an informant (*Electronic Data Systems Interna-*

*tional Corp.* (1986), 278 N.L.R.B. 125, 122 L.R.R.M. 1333 (company attorney unlawfully told employee to give him names of employees attending union meeting and what had been said), or a solicitation to do so (*Midwestern Mining & Reclamation, Inc.* (1985), 277 N.L.R.B. 221, 121 L.R.R.M. 1170 (employer unlawfully urged employees to attend union meetings and report to employer what took place); *United Artists Theatre Circuit, Inc.* (1985), 277 N.L.R.B. 115, 121 L.R.R.M. 1283 (employer's solicitation to attend union meetings and report on employee activities violated section 8(a)(1) of the NLRA even though no threat or other coercion occurred, and even though the request was never acceded to or acted upon)). However, Karraker's statement indicated to St. Onge he wanted to know what transpired at Association meetings. This is sufficiently coercive to constitute a violation of section 14(a)(1) of the Act. The Labor Board's decision here was not against the manifest weight of the evidence.

Accordingly, we affirm the opinion and order of the Illinois Educational Labor Relations Board.

Affirmed.

GREEN, P.J., and LUND, J., concur.